PEKIN WOOD PRODUCTS COMPANY *v.* MASON.

Opinion delivered February 8, 1932.

*Exby, Moriarty* and *Pierce,* and *John C. Sheffield* and *W. G. Dinning,* for appellant.

*Brewer & Cracraft,* for appellee.

BUTLER, J. This suit was brought in the Phillips Circuit Court by the appellee, as administratrix of the estate of T. S. Mason, for the benefit of herself as widow and for the minor children to recover damages arising from the death of the intestate, which occurred while he was in the employ of appellant and while engaged in the performance of his duties. On a trial of the case the appellee recovered verdict in the sum of $25,000, and from the judgment entered in accordance with the verdict this appeal has been duly prosecuted.

The court gave nine instructions at the request of the plaintiff, the defendant (appellant) contenting itself with the request for a peremptory instruction. The principal ground urged for reversal and argued by the appellant is for the failure of the court to direct a verdict in its favor, the contention being that there was no substantial evidence to sustain the allegations of the complaint or to warrant the instructions given to the jury at the request of the plaintiff.

The following facts were either admitted or established by the undisputed testimony: T. S. Mason was a veterinary surgeon, 42 years old, living in Helena, where he had practiced his profession for a number of years until some time in 1930, when, owing to the general

business depression, his practice fell off so much that he was forced to do something else for a living. Before this time he had done a lucrative business, and for the seven years preceding 1930 his income from the practice of his profession had averaged in excess of $5,000 a year, all of which he contributed to his family except about $25 or $30 a month which he used for his personal expenses. Sometime in September, 1930, Dr. Mason secured employment with the appellant company as a helper to the night engineer in charge of the boiler room. Among other things it was his duty to keep the boilers properly supplied with fuel. This fuel consisted of sawdust and ground up shavings and refuse lumber accumulated from various parts of the plant and blown into a large cylindrical-shaped bin about fifty feet high, twenty-six feet in diameter at the bottom and twenty-two feet at the top. The bin terminated at the bottom in a hopper with the sides of the same sloping upward to where it met the cylinder at an angle of 45 degrees. This hopper was about eight feet square at the bottom. Seated in the bottom of the hopper were three troughs, in which large iron screws or augers revolved, which were about 12 inches in diameter and so arranged that the tops of the screws were about six inches above the floor of the hopper. These troughs and screws extended into another and larger trough, the top of which was covered, and in this top were two doors, which could be lifted up when occasion demanded, and were large enough for a man to enter. At one end of this large trough and right at the hopper was a fan. The other end of the trough extended beyond the bin to the furnace. The fuel accumulated from other parts of the mill was conveyed by large pipes to the top of the bin and blown into it. As it fell to the bottom of the hopper, the fan and screws were put in operation by electric power, the revolving screws carrying the sawdust into the larger trough, where the fan blew it with great force through the large trough to the furnace where it was burned to

create steam.  At times, when the sawdust was damp and shavings which had not been ground up were conveyed into the bin, the fuel would stick to the sides of the bin and gradually increase in quantity until it would "arch" and prevent the sawdust coming in from the top from falling to the bottom of the hopper.  Below this "arch" the fuel would fall and be conveyed out, so that frequently a cavity would occur between the fuel accumulated and clogged in the bin above and the floor of the hopper.  In order to dislodge this fuel so that it might fall, several plans were adopted; one, to descend from the top of the bin by means of a chair attached to a rope and pulley and loosen the sawdust with a pole; another, to pound the outside of the bin with a hammer which would sometimes dislodge the sawdust; another, to push iron rods from the outside of the bin through small apertures made for that purpose into the sawdust; and still another, to enter the bin from below by raising the doors on the top of the fan trough, crawling in through that trough between the screws into the bottom of the hopper, and from that point to dislodge the sawdust from above by punching it with a pole.  To loosen the sawdust by entry from the top of the hopper required two men— one to go down in the chair and the other to lower him by means of the rope and pulley.

On the night of October 26, 1930, the fuel in the bin ceased coming through the augers into the furnace, and to unclog the fuel so that it might fall and be conveyed out, Dr. Mason entered the bin from below.  He was given a pole by the night engineer, and all of the fuel became dislodged, falling upon him and completely covering him.  An alarm was given, and a rescue was attempted, but before he could be reached and uncovered he had died from suffocation.  Dr. Mason had been work-in about six weeks before this occurrence, and it was alleged and admitted that he had had no experience in that kind of work.  It was also alleged that it had been the practice in dislodging the fuel from the bin to direct an employee to enter through the opening at the bottom

of the conveyor (or fan trough), and that this was so small that it could not be entered without assistance; that this method of dislodging the sawdust was more expeditious but was highly dangerous, and known to be so by the engineer in charge, but not known by Mason. It was alleged that on the night of his death Mason was directed by his superior, the night engineer, to enter through the small opening at the bottom of the bin to relieve the congestion of the fuel for the purpose of enabling it to be fed to the furnace, and that, relying upon the knowledge of his superior, and without appreciating the risk, he entered the bin; that, while inside the bin, he was caught in a slide of sawdust and killed; that his death was caused by the negligence of the defendant's servant, the night engineer and superior of the deceased, in failing to warn Mason of his danger in entering the hopper, that his death was caused thereby, and that defendant was further negligent in putting the screws and fan in operation while Mason was in the bin, causing them to revolve and grasp his left foot and trouser leg, crushing the foot and preventing him from escaping from the falling sawdust.

While admitting the tendency of the sawdust to become impacted and to "arch" in the bin, and that entry at the bottom of the bin was dangerous and known to be so by the night engineer, and that it was the duty of Mason to keep the fuel moving toward the furnace, the appellant denied that the deceased entered at the bottom at the invitation or direction of the night engineer or that the latter had put in motion the fan and screws, but contended that the deceased had been expressly warned of the dangers incident to his work, and had entered the bin from the bottom without the knowledge of the night engineer and in violation of the express command of his superiors, and that, therefore, his death was occasioned by his own negligence and not through any negligence of the appellant.

Ross Smith, appellant's chief engineer who had employed Mason, testified that he had explained in detail

the manner in which the fuel was to be fed to the furnace and the construction of the bin, and had instructed Mason that the congestion of the fuel in the bin was to be relieved only by entering from above in the chair; that he must not enter from below and had warned him of the danger.

John (Monty) Smith, the night engineer under whom Mason was working on the night of his death, testified that he had also warned Mason of the danger of entering the bin from below and had directed him not to do so; that he was not present when Mason entered the bin and did not know that he had done so until witness discovered him within the bin at the bottom just before the sawdust fell upon him.

The testimony of Ross Smith was corroborated by that of an employee of appellant who testified that he had heard the warning given by Smith to Mason regarding the danger attendant upon the bin.

To contradict this testimony and to establish her allegation, the plaintiff relied largely on circumstances proved. The settled rule, which has been many times approved by this court, is that a well connected train of circumstances is as cogent of the existence of a fact as an array of direct evidence, and frequently outweighs opposing direct testimony, and that any issue of fact in controversy can be established by circumstantial evidence when the circumstances adduced are such that reasonable minds might draw different conclusions. *St. Louis, I. M. & So. Ry. Co.* v. *Hempfling,* 107 Ark. 476, 156 S. W. 171; *St. Louis, I. M. & So. Ry. Co.* v. *Owens,* 103 Ark. 61, 145 S. W. 879; *Midland Valley Ry. Co.* v. *Ennis,* 109 Ark. 206, 159 S. W. 214; *St. Louis-San Francisco Ry. Co.* v. *Bishop,* 182 Ark. 763, 33 S. W. (2d) 383.

The circumstances relied on by the appellee are as follows: Cooper, the employee whose testimony corroborated that of Ross Smith as to the warning given, stated that when Ross Smith and Mason went up together on the day of the latter's employment to the top of the bin, witness was at the bottom hammering on the bin to

loosen the sawdust, and when they had descended, Mason came to where witness was and inquired how they got the sawdust down, and was told, "We beat it down, if we could. If we could not, we go up on top and work it down." Mason asked if that was the place that had been shown him, and was told, "Yes, that is the only place that you can get into the sawdust," and then Mason said, "Do you reckon I will have to go into it?" and was answered, "No, I don't reckon you will." These questions were significant of the question whether or not he had been warned of the danger and had the methods of unclogging the fuel explained to him, and was a circumstance indicating that he had not.

The night engineer and Mason were the only ones who were shown to have been engaged in the operation around the furnace on the night of Mason's death. The testimony of a witness who had worked for several months in the performance of the same work that Mason did, and who was shown to have been familiar with the situation, was to the effect that it was impossible for one to enter the bin through the fan trough without assistance; that it was necessary for one to hold up the doors of the fan trough when another crawled through; that these doors would fall immediately on being released; that, even with assistance, one could not enter at all when the screws were in motion and the fan operating; that the force of the air from the fan was so strong that it would blow one entering the trough under the boilers. When the body of Mason was uncovered, there was a quantity of sawdust and shavings between it and the bottom of the bin. By the side of the body was the flashlight of the night engineer, and there was a pole in the hands of the dead man. He had on two pairs of coarse trousers or overalls, and both pairs at the bottom of the left leg were torn in several places and hanging in fragments to the remainder of the fabric. When the body was prepared by the undertaker, it was discovered that the big and second toes of the left foot were mashed flat—the nail of the big toe was mashed completely off

and that of the second toe nearly so. The foot was bruised, and a quantity of blood had escaped sufficient to soak through the leather of the shoe. There was also testimony to the effect that frequently men would be sent in at the bottom to dislodge the fuel from above, and that while the employee would be in the bin the fan and feed screws would be put in operation to remove the sawdust as it fell.

According to the familiar rule, this court must give to these circumstances their highest probative value in favor of the appellee and indulge every inference which is reasonably deducible from them in support of the finding of the jury. *Gaster* v. *Hicks,* 181 Ark. 297, 25 S. W. (2d) 760. Giving to the above circumstances the force prescribed by the rule stated, we conclude that they come within the principles heretofore announced, and that there was sufficient evidence to warrant the submission of the issues to the jury. It is true that John Smith, the night engineer, denied helping Mason into the bin, but there was no one else to help him, and he could not have got in without assistance. Therefore the jury might have reasonably concluded that the circumstances refuted the testimony of John Smith, especially when he admitted that he discovered the man inside, and, instead of ordering him out, he gave him a pole with which to dislodge the fuel, and failed to give any satisfactory explanation as to why his flashlight was found in the possession of the deceased. There was no direct testimony as to whether or not the fan and screws were put in motion after Mason entered the bin, but, as it was impossible for him to enter while they were in motion, the injury to his foot must have happened after he had entered the bin, and the jury might have reasonably inferred that these screws and fan were put in motion after Mason's entry, and that in endeavoring to escape from the falling sawdust his foot and trouser leg were caught in the revolving screws, which prevented his egress through the point of entry. In removing the body, care was taken not to injure it, and it might be well believed

from the quantity of sawdust found between the body and the floor of the bin that, when Mason's injury occurred, he began struggling upward in an effort to rise above the sawdust, in which effort he almost succeeded, for it is shown that there was only about three or four feet of sawdust above him and almost an equal amount below.

Instructions Nos. 4, 6 and 7 for the appellee are the only ones of which appellant complains in its brief, on the ground that they were "not supported by any testimony of any character." Instruction No. 4, in effect, told the jury that if the deceased entered the fuel container, and while therein the screws and fan were started in motion, and this was in any manner the proximate cause of the death, and this could have been foreseen in the light of the attendant circumstances, and the deceased at the time was not guilty of contributory negligence and had not assumed the risk, the verdict of the jury should be for the plaintiff.

Instructions Nos. 6 and 7 were on the doctrine of assumed risk, and in these instructions it was left to the jury to say whether Mason was acting under the direction of his superior, and they were told that, if this were true, Mason had a right to rely upon the judgment of his superior unless the risk was so obvious that no prudent man would have obeyed the command.

From what we have already said, it follows that in our judgment these instructions were not abstract, but had substantial evidence upon which to base them.

It is also urged that the court erred in admitting the testimony of five witnesses, each of whom was called in rebuttal, and it is argued that the purpose for which these witnesses were introduced was to prove the declarations of the employees as to who was responsible for the injury, and that such testimony was incompetent under the rule that "declarations of an employee as to who was responsible for any injury made after its occurrence is incompetent as against his employer, for the reason that his employment does not carry with it authority to make declarations or admissions at a subsequent time

as to the manner in which he had performed his duties of employment." *Casteel* v. *Yantis-Harper Tire Co.*, 183 Ark. 475, 36 S. W. (2d) 406; *River R. & H. Const. Co.* v. *Goodwin*, 105 Ark. 247, 151 S. W. 267.

An examination of the record discloses the fact that this testimony does not violate the rule. John Smith was the first witness called by the appellee. He was asked to tell how and why Mason happened to go inside the bin, and, after denying any knowledge of it, he was asked if it were not a fact that he had told Mason to enter the bin and assisted him to do so. He denied this. He was then asked if he had not made statements of that nature to and in the presence of various persons who were named. He answered that he had not. He was then excused, and the attorney for the appellee made this announcement to the court: "I presume it would be proper at this time—if not, I want to make it clear—that in view of the fact that five or six people—reputable people—have told me of statements that this witness has made that he denied, I feel that I have been surprised by his statements, and I expect to introduce these witnesses to impeach him at this time." No objection was made to this statement or to the indicated conduct in calling witnesses for the purpose of impeachment, and, after having called several witnesses who testified for the appellee, five witnesses were called in rebuttal of the testimony of John Smith and to impeach his testimony. The testimony of these witnesses was expressly introduced for, and limited by the court to, purposes of impeachment only, and the jury was instructed not to consider the evidence as affirmative testimony on the part of the plaintiff, but only as to the credibility of the witness whose testimony was sought to be impeached. It is the contention of the appellant that the testimony of these witnesses was improper, first, "for the reason that it tended to impeach the testimony of a witness called by the plaintiff herself; in the next place, it contradicted a witness on a matter of evidence that was wholly inadmissible for any purpose." We do not agree with

the appellant, but think that, since John Smith was the only person who was at or in the vicinity of the bin at the time of the accident, the appellee might well have thought his testimony was indispensable, and from information he had received believed that he would testify to a state of facts which would impose liability on the appellant, and, when appellee's counsel discovered that he would not testify as thought, the appellee was then justified in introducing other witnesses to show that he had made statements different from his present testimony. Section 4886, Crawford & Moses' Digest, provides: "The party producing a witness is not allowed to impeach his credit by evidence of bad character unless it is a case in which it was indispensible that the party should produce him, but he may contradict by other evidence and by showing that he has made statements different from his present testimony." The testimony offered in rebuttal was therefore competent. *Ward* v. *Young,* 42 Ark. 553; *Roy* v. *State,* 102 Ark. 691, 145 S. W. 190; *Midland Valley R. R. Co.* v. *Ennis,* 109 Ark. 206, 159 S. W. 214; *Williams* v. *Cantwell,* 114 Ark. 542, 170 S. W. 250; *Jonesboro-Lake City R. R. Co.* v. *Farner,* 112 Ark. 447, 166 S. W. 571; *Graves* v. *Gardner,* 137 Ark. 197, 208 S. W. 785. There can be no doubt that the testimony sought to be elicited from the witness was competent. It was not a declaration sought to be established by the testimony of another, but merely the narration of what the appellee had been led to believe had actually occurred.

Since all the questions were fully and fairly submitted to the jury by proper instructions, and there is substantial testimony to sustain the verdict, the judgment must be affirmed. It is so ordered.