MFA MUTUAL INSURANCE CO. v. WESLEY C. PEARROW

5-4681                                    434 S.W. 2d 269

Opinion Delivered December 9, 1968

*Odell Pollard* for appellant.

*Lightle & Tedder* for appellee.

J. Fred Jones, Justice.    The appellee, Wesley C. Pearrow, purchased a fire insurance policy from the appellant, MFA Mutual Insurance Company, under the terms of which, appellee's house and furniture were insured against loss by fire.    The house was insured for $4,000 and the furniture for $2,000.    Appellee's house and furniture were damaged by a fire and he made demand upon the appellant for the policy limits of $4,000 on the house and $2,000 on the furniture.    Appellant refused payment and appellee brought suit in the White County Circuit Court for $6,000, plus statutory penalties and attorney's fees.    The appellant defended on the ground that appellee had either burned his house, or had conspired with others to have it burned, and that the fire did not result in such total loss as to require payment of the face amount of the policy.

After hearing the evidence at the trial, the court instructed the jury that there was no substantial evidence upon which a finding of arson or conspiracy to commit arson could be based, and the case was submitted to the jury solely upon the question of extent of loss and how much appellee should recover from appellant. The jury returned a verdict in favor of the appellee for $4,000 for loss of the house and $1,000 for damage to the contents. A judgment was entered on the jury's verdict, and appellee was awarded an attorney's fee of $1,000 and a statutory penalty of $480.

Upon appeal to this court, appellant relies on the

following points for reversal:

> "The trial court committed error (a) in instructing the jury that there was no substantial evidence on which to base a finding that appellee had either burned his house or conspired with others to have it burned and (b) in refusing to give defendant's requested instructions No. 1 and No. 2, which instructions would have submitted these issues to the jury.
>
> The trial court committed reversible error in permitting appellee to give hearsay testimony which was so prejudicial as to prevent appellant from obtaining a fair and impartial trial.
>
> The trial court committed reversible error in allowing appellee to recover an attorney's fee and a statutory penalty when the jury's verdict was for less than the amount which appellee sought to recover."

The appellant's defense of arson, or conspiracy to commit arson, was based on circumstantial evidence of a very unusual nature. The house involved was a vacant rent house facing east on the west side of the highway about one mile from the town of Balb Knob. Mr. and Mrs. Harrell lived across the highway from appellee's house and a Mr. Loucks lived about two hundred and fifty yards west of the house. Mr. Loucks' private road leaves the highway just north of the appellee's house and runs from the highway along the north side of appellee's house.

Mr. Loucks testified that between 1:00 p.m. and 2:00 p.m. on August 3, 1965, he had started to his home from Bald Knob and as he passed along the side of appellee's house, one Raymond Feagin whom he knew, and another man rushed from the rear door of the house into some drooping limbs of a weeping willow tree; that he saw the tree limbs shaking and thought the men were

fighting. He drove on home and went to work on his tractor. About 5:00 p.m. he heard that there had been a fire in the appellee's house.

Mr. and Mrs. Harrell testified that as they were eating a late lunch between 1:00 and 2:00 p.m. on August 3, they saw appellee's definitely identified truck drive into the road beside his house and turn into the drive in the back of the house. It only stayed a very short time during which its horn sounded, then it left in a hurry as it had come. About thirty minutes later, the Harrells observed smoke coming from the Pearrow house. The city fire department extinguished the fire and found a five gallon oil can, the odor of gasoline about the premises and ample evidence that the fire was of incendiary origin. About midnight, members of the fire department extinguished another fire at the same house and this time they found sponges soaked in gasoline, or other flammable fluid, on the roof of the building and a strong odor of fuel oil or gasoline was about the premises, the same as detected on the afternoon of August 3.

Raymond Feagin and Ronald Anthony Turpin were convicted of arson on pleas of guilty in connection with the fire. Turpin was sentenced to five years in the penitentiary and Feagin was given a suspended sentence. They both testified at the trial. Turpin testified that he did not know the appellee, but that on the morning of August 3 he discussed burning the house with Feagin at a cafe across the street from a used car lot, and then Turpin testified as follows:

"Q. Did you have an opportunity to discuss the burning of the Pearrow home at any place or at any time other than the discussion at the bus stop cafe?

A. Yes.

Q. Where did the other conversation take place?

A.  At the used car lot across the street.

Q.  Whose used car lot?

A.  Billy Ward's used car lot.

Q.  Where, in that used car lot, did the conversation take place?

A.  Raymond and I talked about it in the trailer.

Q.  Whose trailer?

A.  Billy's.

Q.  What is that trailer used for?

A.  I believe just a business office.

Q.  Is that where he conducts his business?

A.  Yes, sir.

Q.  Was anybody else present when the conversations was had?

A.  On one occasion.

Q.  Who was present?

A.  Only it was between he and I, not between me and Raymond.

Q.  Who did you discuss it with?  Not what was said.

A.  I talked with Billy about it.

Q.  Where did you talk to Billy about it?

A.  In the trailer.

Q.  What day did these conversations take place?

A.  The same day I burned the house.

Q.  How did you know where the house was?

A.  Raymond took me and showed me the house.

Q.  Had you ever been to the house before?

A. No, sir.

Q. Why were you going to burn it?

A. I was going to burn it for one hundred dollars. I don't know what he was going to burn it for.

Q. Who was going to give you the hundred dollars?

A. Raymond.

Q. Did Billy know it?

A. There was no way he could know it."

According to this witness he and Feagin left the car lot in Feagin's automobile and drove by and saw the house. They then returned to the cafe and talked about it some more and then went to Billy Ward's used car lot and obtained a five gallon gas can from behind the trailer. Turpin then drove Feagin's automobile to a gas station, had the can filled with gasoline, then returned and picked Feagin up and they both drove out to appellee's house in Feagin's black and white Buick automobile. According to this witness, they arrived at the appellee's house with the gasoline about 1.30 or 2:00 p.m. They saturated the rugs and walls of the building with gasoline. The electricity had been turned off in the house, but the pilot light to the hot water tank had been left burning and an explosion occurred, blowing out one window of the house and blowing the witness into another room of the house. He says that he had to fight with Feagin to get him out of the house, that Feagin was on fire and that he extinguished the fire on Feagin out in the back yard. They then drove back to town. They then drove back to the house and saw that it had not burned.

"A . . . I know we drove back and saw we hadn't accomplished anything and he said he was through with it.

Q. You and he drove back that afternoon?

A. Yes, sir, I had enough beers in me that I decided I would finish the job.

Q. Raymond had enough after the first trip?

A. Yes, sir.

Q. When did you go back out there?

A. I guess about ten o'clock at night, I thought it was earlier, but everybody said it burned later that night.

Q. What did you do about burning it the second time?

A. I had bought a bunch of sponges at Vaughan's Super Market and I saturated them and threw them on top of the house and I let the gas run down the walls and set the blaze from the side of the house and it went up in flame.''

This witness testified that he had never heard of the appellee. On recall he testified that he sent his wife to Feagin for the $100 Feagin had promised to pay him, but that Feagin had no money. He denied that he sent his wife to appellee for money and denied that he knew anything about his wife going to appellee for money.

Feagin testified that he had known appellee for a number of years but had not talked with him except to speak when passing. He says that he did not know that the appellee had a house where it was located; that Turpin told him that he had a score to settle with the Pearrows and requested him to drive Turpin out to appellee's house.

''A. He just asked me to drive him out there, that he had a score to settle with the Pearrows.

Q. What did you do?

A. I went out there, I didn't know this gas was in my car, and he jumped out and run in the house and I sat in the car a couple of minutes and I went to the door and about the time I got to the door the thing exploded.

Q. Where were you?

A. I just got to the door and Ron was back in the house.''

Feagin denied that he promised to pay Turpin anything, denied that Turpin tried to collect from him and testified that he later apologized to the appellee for the part he played in burning the house.

We are of the opinion that the trial court erred in instructing the jury that there was no substantial evidence on which to base a finding that appellee had either burned his house or conspired with others to have it burned. Appellee was not being prosecuted for burning his house. He was the plaintiff in a civil action to recover on an insurance policy and the preponderance of evidence rule applied.

In *Meyers* v. *Hobbs,* 195 Ark. 1026, 115 S.W. 2d 880, this court said:

" 'The settled rule, which has been many times approved by this court, is that a well connected train of circumstances is as cogent of the existence of a fact as an array of direct evidence, and frequently outweighs opposing direct testimony, and that any issue of fact in controversy can be established by circumstantial evidence when the circumstances adduced are such that reasonable minds might draw different conclusions.' *Hanna* v. *Magee,* 189 Ark. 330, 72 S.W. 2d 237; *Pekin Wood Products Co.* v. *Mason,* 185 Ark. 166, 46 S.W. 2d 798; 23 C.J. 48.''

and earlier in *St. Louis, I.M.&S. Ry. Co.* v. *Owens,* 103 Ark. 61, 145 S.W. 879, we said:

> "...it is ... well settled that any material fact in controversy may be established by circumstantial evidence, and that, though the testimony of witnesses may be undisputed, the circumstances may be such that different minds may reasonably draw different conclusions therefrom. Such a state of case calls for a submission to the jury of the questions at issue; and where the circumstances are such that different minds may reasonably draw different conclusions therefrom, and the result is not a mere matter of conjecture without facts or circumstances to support the conclusion, then it is the duty of an appellate court not to disturb the finding of the jury."

Also in *Burcher* v. *Casey,* 190 Ark. 1055, 83 S.W. 2d 73, we said:

> " 'If the evidence is conflicting, it is error for the court to grant a nonsuit or direct a verdict.'

> In determining whether a case should be submitted to the jury, all evidence which is introduced by the party who asked that such evidence be submitted must be regarded as true, and every inference which can fairly be drawn from the evidence must be drawn in favor of such party."

and in *Barrentine* v. *The Henry Wrape Co.,* 120 Ark. 206, 179 S.W. 328, we said:

> "In determining on appeal the correctness of the trial court's action in directing a verdict for either party, the rule is to take that view of the evidence that is most favorable to the party against whom the verdict is directed, and where there is any evidence tending to establish an issue in favor of the party against whom the verdict is directed, it

is error to take the case from the jury. *Williams v. St. Louis & S.F.R. Co.* 103 Ark. 401, 147 S.W. 93; *Phoenix Cement Sidewalk Co.* v. *Russellville Water & Light Co.,* 101 Ark. 22, 140 S.W. 996; *Curtis* v. *St. Louis & S.F.R. Co.,* 96 Ark. 394, 131 S.W. 947."

It is perfectly obvious, from the record before us, that there were a lot of loose ends left at the conclusion of the trial in this case. Most of the appellant's evidence, as well as its argument, is directed at appellee's lack of inquiry and apparent lack of concern about the fires in his house during the time of the fires and after the loss. He made no inquiry of the neighbors or of the police or fire department. Lack of inquiry or apparent interest standing alone would not support a verdict against him, but from all the circumstantial evidence, both explained and unexplained in the record before us, we conclude that if the jury had returned a verdict for the appellant there would have been some substantial evidence to have sustained the jury verdict.

The appellee testified that he moved from the house in April or May and even though a real estate agent testified that the house was rented at one time while he was showing it for sale, no one testified how long it had been vacant yet the pilot light was burning on the hot water tank on the 3rd day of August when Turpin saturated the place with gasoline between 1:30 and 2:00 p.m. in broad daylight and in sight of neighbors on that day. Indeed from some vague reference in the record as to another fire in which Turpin was implicated, the jury might even have found that a bold and vicious system was developing in the community of burning houses for profit.

The most damaging circumstantial evidence against appellee in this case, however, is that appellee's own pickup truck was positively identified by the neighbors as being at the house at the same time Turpin says that he and Feagin were there attempting to burn the house.

The fire occurred only a few minutes after appellee's truck left the premises and Turpin and Feagin were seen rushing from the back door of the house by still another neighbor who was close enough to recognize Feagin. Apparently no one saw Feagin's black and white Buick automobile on the premises at any time.

Turpin testified that he did not know the appellee and had never heard of him. Feagin testified that he casually knew the appellee, but that he didn't even know appellee owned a house at the location where he drove Turpin. Feagin admits that he drove Turpin to the house, but says that he did not know that Turpin had a five gallon can of gasoline in the back of Feagin's Buick automobile. The appellee testified that he had known Feagin for twenty years but he was not asked if he knew Turpin. The fire in the early afternoon was extinguished by the fire department and the five gallon can was found. Turpin knew where he purchased the sponges he used that night when he returned alone and finished the job, but he was not asked where he obtained the gasoline with which he saturated the sponges on that occasion.

Turpin said he discussed burning the house with Feagin, as well as Billy Ward. He says that he purchased an automobile that same day from Billy Ward and used it in his final trip to burn the house that night. Ward was not called as a witness.

There is no evidence here that either Turpin or Feagin were pyromaniacs, and there is no evidence at all that the house was burned for spite or out of malice toward the appellee. Uncontradicted evidence places appellee's truck at the scene of the fire within the same period of time Turpin and Feagin were there in the commission of arson. This evidence is uncontradicted and remains unexplained.

We conclude, therefore, from the overall evidence

in this case, that the trial court erred in directing a verdict for the appellee on the question of arson, and that the cause should be reversed and remanded for a new trial for that reason.

We also take note of appellant's second point since this case is being remanded for a new trial.

On cross-examination Turpin testified as follows:

"Q. You sent your wife to Wesley Pearrow?

A. No. I didn't. I sent my wife to Raymond to collect the hundred dollars and Raymond told her he didn't have any money.

Q. She didn't report to you about going to Wesley Pearrow?

A. Did she go to Wesley Pearrow?

Q. I ask you if she did go to him?

A. Not that I know of."

On direct examination of the appellee, the record is as follows:

"Q. You heard the testimony about Mrs. Turpin, tell us about it?

A. She tried to blackmail me.
MR. POLLARD: I object to this. Counsel for plaintiff was informed when he called Ron Turpin back and he was informed after he explained about him sending his wife to Mr. Pearrow that he would not be in position to plead surprise. Mr. Lightle said he knew what Mr. Turpin's answer would be, for that reason he was not surprised at what Mr. Turpin's answer would be. It is not proper rebuttal for that reason.

MR. LIGHTLE: For impeachment purposes I

have a right to it.

THE COURT: On this issue, your own defense.

Q. What did his wife tell you?

A. She told me to give her a hundred dollars to get Ron out of jail or he was going to smear me and my friends all over if I didn't give her the hundred dollars. She came to my house on a Sunday morning.

MR. POLLARD:

I object to that. Mrs. Turpin is not a party to the law suit.

THE COURT:

The objection is overruled.

MR. POLLARD:

Note my exception.''

This testimony was elicited and admitted under the guise of impeachment, but we hold that the trial court erred in admitting it over appellant's objections. Mrs. Turpin had not testified at all, the appellee had not testified on the point involved, and Turpin only testified that he did not send his wife to see the appellee and that if she did contact the appellee he didn't know anything about it. The testimony of appellee on this point clearly does not impeach the testimony of any witness. It is clearly hearsay testimony and is clearly inadmissible. We assume, however, that since this case is reversed on appellant's first point, the other points raised on this appeal will not arise again at a new trial.

Reversed and remanded.