[No. 2948–2. Division Two. January 19, 1979.]

GREAT AMERICAN INSURANCE COMPANY, *Respondent*, v. K & W LOG, INC., ET AL, *Appellants.*

*Charles B. Welsh,* for appellants.

*Clarke & Bovingdon* and *Fred G. Clarke, Jr.,* for respondent.

REED, J.—Defendants K & W Log, Inc., and H. M. (John) King appeal from a declaratory judgment obtained in Grays Harbor Superior Court by plaintiff Great American Insurance Company (Great American). The judgment declares that a certain insurance policy issued by Great American affords no coverage for the destruction by explosion of three pieces of K & W's logging equipment. We affirm.

Defendant King and his wife, residents of Raymond, Washington, own 98 percent of the capital stock of K & W, a Washington corporation. King is president and manager of the corporation, which in 1975 owned three major pieces of heavy logging equipment: a Skagit yarder or "tower," a shovel–type Linkbelt loader and a D–7 Caterpillar tractor. The equipment, which was subject to liens for approximately $109,000, was insured by Great American against loss or damage for $183,500. The corporation owed other obligations and had been operating at a substantial loss. Although King had been engaged as an independent logger for some 46 years, he had little in the way of assets and was personally indebted for about $9,000. No evidence was offered at trial that King had guaranteed or was otherwise personally responsible for his corporation's debts.

In late 1975, King was engaged in a logging operation on the Cedar River watershed near North Bend. On October 15, 1975, because weather conditions would no longer permit logging, King pulled his equipment out of the woods and stored it temporarily in a yard belonging to the Mountain Tree Farm. The storage yard was located on a private logging road some 12 miles distant from a metal gate which gave access to the area. King and others working in the area had keys to the gate.

On November 24, King was living in a mobile home park at North Bend, about 30 miles from the storage yard. About 6 p.m. that evening he was informed by telephone

that his equipment was on fire. King drove to the scene where he found other loggers and firefighting units extinguishing fires which were still burning on certain portions of the tower which had not yet been extensively damaged. The loader and D–7 tractor were sitting nearby and appeared to have been untouched. After the fire was extinguished King returned to his trailer home, arriving between 8 and 9 p.m.

At approximately 10:30 p.m., King decided to check on his equipment and drove back to the scene; he unlocked the gate to gain entrance and relocked it behind him. According to King, he met a "kind of a blue pickup" leaving the area at a point about 2 miles inside the gate. He could not identify the vehicle. Upon arriving at the scene he found the loader had been driven over a steep bank 75 to 100 feet from its original position; it was badly damaged and burning. King returned to North Bend—it was now midnight—and notified the fire department.

Sometime after Thanksgiving a portion of the logging road washed out, preventing all vehicular access to the storage site. Great American intended to move the equipment to a safer location and on or about December 10, King employed his D–7 tractor to repair the road, after which the tractor was returned to the storage site. That day or the next, King and two others drove to the site to prepare the equipment for the move. Upon arrival the men observed numerous sticks and boxes of dynamite had been placed on and underneath the tower. They immediately called the King County bomb squad; Lieutenant Thomas C. Regan and two other officers arrived on the scene. Investigation revealed approximately 750 pounds of unexploded dynamite, time fuses and detonators packed around the three pieces of equipment. Photos were taken and the dynamite was defused and removed to a safe distance where it was detonated.

While at the scene, Lieutenant Regan—"within earshot of Mr. King"—was openly critical of the "bomber's" use of

time fuses in place of "Primacord" or "Detcord"[1] in setting the charges. According to Lieutenant Regan the dynamite failed to detonate because of the amateurish methods used.

K & W's equipment later was moved to another storage yard located approximately 4 miles from North Bend, where it was left sitting among numerous pieces of heavy machinery belonging to other loggers. On January 5, 1976, the yarder, loader and D–7 tractor were completely demolished by a dynamite blast. Investigation by state and federal officers disclosed that approximately 600 to 700 pounds of "Trojan" dynamite had been used and that "Detcord" had been employed to set off the charges. The K & W equipment was the focal point of the blast and had been totally destroyed, but other equipment standing nearby sustained only minor "fragmentation" damage.

After rejecting King's proof of loss,[2] Great American initiated the present lawsuit seeking to be relieved of liability under its policy and alleging (1) King had caused or arranged for the destruction of the insured property; and (2) King had made a false and fraudulent proof of loss. The trial court agreed with Great American and entered judgment accordingly. K & W and King appealed.

Defendants' assignments of error present the following issues: (1) whether an insurance company's defense of willful destruction of the insured property by the insured may be proved by a preponderance of the evidence or whether a

---

[1]Detcord (Primacord, P.T.F., E–cord) is a specially manufactured cord containing an explosive core. When Detcord is connected to several charges in sequence and detonated at its free end by dynamite cap, the ensuing explosion travels along the cord, resulting in almost simultaneous detonation of the charges. Thus, its advantage over separate time fuses attached to each charge, some of which may fail to explode. A peculiarity of Detcord is that if it is crimped or bent at a sharp angle the explosion will not follow the cord but will exit at the crimp or bend. In fact, a partial reel of Detcord found at the January blast site (discussed below) had such a crimp and had not exploded along its full length.

[2]Prior to commencing this suit, Great American paid $109,000 to the lien holders who were named in a Protective Lenders loss payable clause of the policy. Under such clauses policy defenses against the insured cannot be asserted. For a general discussion of the availability of policy defenses against mortgagees, *see* Annot., 19 A.L.R. 1444 (1922).

higher standard of proof is required, such as clear and convincing evidence; and (2) whether the evidence presented to the trial court, which was wholly circumstantial, is sufficient to support the trial court's findings, conclusions and judgment. We hold that the defense may be proved by a preponderance of the evidence which may be entirely circumstantial. We further hold the evidence in this case sufficiently supports the trial court's findings and judgment.

Defendants would have us adopt a more stringent standard of proof. Their theory is that because the affirmative defense of incendiarism charges both a fraud and a commission of a crime, the evidence in support thereof must be "clear and convincing" before it will overcome the common–law presumptions of innocence of crime and lack of fraudulent intent. *Cf. National Surety Co. v. Petersen,* 155 Wash. 113, 283 P. 668 (1930); 30 Am. Jur. 2d *Evidence* §§ 224, 1167, 1169 (1967); 46 C.J.S. *Insurance* § 1359 (1946).

■■■ We recognize that some courts adhere to the more strict standard of proof espoused by defendants, *see, for example, Milonczyk v. Farmers' Mut. Fire Ins. Co.,* 200 Wis. 255, 227 N.W.2d 873 (1929), and *Carpenter v. Union Ins. Soc.,* 284 F.2d 155 (4th Cir. 1960). Such is not the law in Washington. As early as 1910, in *Bruff v. Northwestern Mut. Fire Ass'n,* 59 Wash. 125, 109 P. 280 (1910), our Supreme Court rejected an insured's contention that a defense of incendiarism must be established beyond a reasonable doubt, and adopted a "fair preponderance of the evidence" test. The *Bruff* rule was adhered to in *King v. King,* 83 Wash. 615, 145 P. 971 (1915). With these decisions, our highest state court joined the ranks of a majority of courts which have addressed this problem. *See for example Honeycutt v. Aetna Ins. Co.,* 510 F.2d 340 (7th Cir. 1975), *cert. denied,* 421 U.S. 1011, 44 L. Ed. 2d 679, 95 S. Ct. 2416 (1975); *Connecticut Fire Ins. Co. v. Fox,* 361 F.2d 1 (10th Cir. 1966); *MFA Mut. Ins. Co. v. Pearrow,* 245 Ark. 795, 434 S.W.2d 269 (1968); *Klayman v. Aetna Cas. & Sur. Co.,* 501 P.2d 750 (Colo. App. 1972); *Werner's Furniture, Inc. v. Commercial Union Ins. Co.,* 39 Ill. App. 3d 59,

349 N.E.2d 616 (1976); *Raphtis v. St. Paul Fire & Marine Ins. Co.*, 86 S.D. 491, 198 N.W.2d 505 (1972); *see also* 18 G. Couch, *Insurance* § 74:664 (2d ed. 1968).

 Defendants, however, contend that by whatever standard it is measured, the evidence here failed utterly to connect defendant King with the destruction of the machinery. We disagree. The decisions in *Bruff* and *King* again are dispositive; in neither of those cases was there any direct evidence the insured either set the fire himself or arranged for its setting. Rather, in both instances the court held that the evidence of the insured's complicity should have been submitted to a jury although it was entirely circumstantial. Incendiary fires are planned and executed covertly and seldom lend themselves to proof by direct evidence. In *State v. Young*, 87 Wn.2d 129, 550 P.2d 1 (1976), the court stated at page 137:

> Arson is an offense which is most often proved by circumstantial evidence. It is one of those crimes which is peculiarly of secret preparation and commission; and it is seldom that the prosecution can furnish testimony of an eyewitness who observed the setting of the fire. It is judicially recognized that a well–connected train of circumstances may be as satisfactory as an array of direct evidence. A. Curtis, *The Law of Arson* § 485, at 517–20 (1936); 6A C.J.S. *Arson* § 48 (1975); 5 Am. Jur. 2d *Arson and Related Offenses* § 47 (1962); *see* W. Hopper, *Circumstantial Aspects of Arson*, 46 J. Crim. L.C. & P.S. 129 (1955).

*See also Raphtis v. St. Paul Fire & Marine Ins. Co., supra,* and *Boone v. Royal Indem. Co.,* 460 F.2d 26 (10th Cir. 1972); *see also* 19 G. Couch, *Insurance* § 79:564 (2d ed. 1968).

We agree with defendants that, where circumstantial evidence alone is relied upon to prove a defense of incendiarism, which would establish both the commission of a fraud and a criminal act, the proofs should do more than throw a mere suspicion of guilt on the insured. As is true in all cases, verdicts may not rest upon speculation and conjecture alone. We are not prepared, however, to adopt a rule

which would require evidence raising an inference or presumption of guilt approaching the inevitable. *Cf.* 46 C.J.S. *Insurance* § 1359 (1946).

In the instant case the evidence from which the trial judge could have reasonably and properly concluded that King was responsible for the loss of K & W's equipment may be summarized as follows: King and his corporation were experiencing serious financial difficulties; the insurance coverage with Great American was more than enough to discharge the secured indebtedness against the equipment; King was present in the North Bend area at the time of the November and December incidents and retained his trailer home there at the time of the January incident although he testified he was in Raymond on that date; plaintiff's evidence placed King alone at the scene of the fire at the time the shovel was pushed or steered over the bluff; few others had access—with 700 pounds of dynamite—to the isolated area where the equipment was stored; dynamite used in the December blast had to have been taken to the site after King repaired the roadway; King could think of no other person with a motive or reason to destroy K & W's equipment (a fact given considerable weight in *Raphtis v. St. Paul Fire & Marine Ins. Co.,* *supra*); in the spring of 1975 King was actively seeking a position in Alaska; he publicly announced in December he had obtained employment with an Alaskan company, and he actually commenced work there in April of 1976.

Additional supportive facts are: King admitted he had worked with explosives during his 46 years as a logger, although he denied any expertise in their use; King was present when Lieutenant Regan criticized the amateurish methods used in the November 24 incident and when Regan opined that detonation would have occurred had the "bomber" used Detcord instead of time fuses; the January blast was successful because Detcord was employed; on January 2 a supply of Trojan blasting powder was stolen from Pacific Wholesale in King's hometown of Raymond; finally, each act of sabotage was directed solely at K & W's

equipment—in the January blast other machinery standing nearby sustained shrapnel damage only.

Certainly a stronger case of circumstantial evidence can be imagined and would have been preferred. We sympathize with the trial judge who was faced with a difficult decision involving a local man with an apparently impeccable record for truth and honesty. The judge's decision would have been less difficult had plaintiff been able to show (1) King had personally guaranteed his corporation's debts; (2) dissolution of the corporation after payment of its debts would have inured to King's financial benefit (the evidence will support an inference to that effect); (3) the dynamite had been traced to the lot stolen from Pacific Wholesale (according to federal Alcohol Tax and Firearm officers, all shipments can be traced from manufacturer to ultimate purchaser); and (4) the Detcord had been traced to King.

In the last analysis, the weight of this evidence was for the trial judge to determine. It is evident he viewed the evidence with appropriate caution before concluding:

> From the circumstantial evidence I can arrive at *no other conclusion* but that Mr. King caused the explosion which destroyed the equipment of K & W Log, Inc. . . . I am *convinced* that Mr. King did the deed.

(Italics ours.)

The judgment is affirmed.

PEARSON, C.J., and SOULE, J., concur.