**DEMYAN'S HOFBRAU, INC., Plaintiff,**

v.

**INA UNDERWRITERS INSURANCE CO., Defendant.**

**No. 81 Civ. 961(MP).**

United States District Court,
S. D. New York.

July 15, 1982.

Weg, Myers & Jacobson by Frank A. Weg, New York City, for plaintiff.

Whitman & Ransom by John C. Young, New York City, for defendant.

## DECISION

MILTON POLLACK, District Judge.

### FINDINGS AND OPINION

In the early morning of January 8, 1980, a three-alarm fire partially damaged the four story, 100 year-old building which, for more than 20 years, had housed Demyan's Hofbrau, a public restaurant, catering establishment and bar in Staten Island. Previously, the premises were used as a brewery. After the fire, plaintiff demolished the Hofbrau building and discontinued in the restaurant business.

Plaintiff Demyan's Hofbrau, Inc., which operated the Hofbrau, is a New York corporation and was owned in equal parts by two brothers, John and Frank Demyan. (The latter died in October 1978 leaving an estate.) The Demyan's real estate holdings which consisted of the Hofbrau building and seven other rental commercial and residential properties adjacent to the Hofbrau were deposited in a second corporation, Demyan's Realty, Inc., also half-owned by each brother.

On February 18, 1981, plaintiff filed this diversity suit to collect the fire insurance policy limits of $300,000, for damage to the building and of $150,000, for damage to its contents, from defendant, INA Underwriters Insurance Co. ("INA"). INA thereupon raised the defenses of arson and plaintiff's implication therein and false swearing by the assured in submitting its proof of claim thereby voiding the insurance.

This case was heard at a Bench trial by the Court without a jury. At the close of trial, the Court made interim findings of fact regarding the incendiary, non-accidental character of the fire and the partial nature of the damage to the building. The Court found:

It has been clearly proved by the defendant and not contradicted by any acceptable evidence worthy of belief, that the fire on January 8, 1980 was of incendiary, non-accidental origin. There were two and perhaps three points of origin of fire, separate and separated, which were caused in each location by a supplied flammable liquid or accelerant to the premises. There was no evidence which is credited by the court of any other cause for the outbreak of the fires. The location of the points of origin and the inverted cones and the pooling make it

clear and convincing beyond peradventure of doubt that arson was the cause at each of the two or perhaps three separate and separated portions of the insured premises.

Furthermore, it is unquestionable that the premises were not a total loss, and that the destruction by fire was partial only.

The Court then requested post-trial briefs on several remaining issues to be decided, viz.: 1) the complicity, if any, of the insured with the arson; 2) whether there was clear and convincing evidence that intentionally false statements regarding proof of loss were made; and 3) assuming that the Court might reach this question, what damages were compensable and under what terms of the policy.

After consideration of the briefs as well as all the testimony and exhibits that were submitted, and on due deliberation, the Court concludes that plaintiff is barred from any recovery on the policy, since on the preponderance of the evidence the Court finds that the assured was implicated in causing the fire which damaged the Hofbrau. In view of these dispositions of the arson issues, the other defense of deliberate false swearing in the proof of claim and the objections to plaintiff's damage proof need not be considered.

*The burden of proof*

■ In New York, the burden is on the insurer to prove the defense of arson and the assured's implication therein, by a fair preponderance of the credible evidence. *Johnson v. Agricultural Ins. Co.,* 25 Hun 251 (4th Dep't 1881).[1] In this regard, since "[d]irect proof of arson is seldom available," it is well settled that arson may be established by circumstantial evidence. *Elgi Holding, Inc. v. Insurance Co. of North America,* 511 F.2d 957, 959 (2d Cir. 1974); *Shawanga Holding Corp. v. New York Property Ins. Underwriting Ass'n,* 57 A.D.2d 677, 677, 394 N.Y.S.2d 69, 70 (3d Dep't 1977).

*Opportunity to Fire the Building*

■ In his testimony, John Demyan named only four persons who had keys and access to the Hofbrau premises: John Demyan, his sister-in-law, Patricia Demyan, his son, John Demyan, Jr. and a bartender (unnamed in Demyan's testimony). The day after the fire John Demyan told the Fire Marshal that his niece, Denise Demyan, and his cook, Steve Jacobson, also had keys to the Hofbrau. In his statement

1. In a footnote set out in *C–Suzanne Beauty Salon, Ltd. v. General Ins. Co. of Am.,* 574 F.2d 106, 112 n.9 (2d Cir. 1978), it was suggested that "clear and convincing evidence" is required in New York to establish the defense of arson—the same standard as in fraud cases.

The reference in the footnote when read in its context clearly relates to the proof of loss, not to the question of arson of the assured alone, since the law in New York is clear, as stated in the *Johnson* case cited in the text above. Indeed, the great weight of authority in other states establishes that the arson origin of a fire attributable to the assured may be established by a preponderance as distinct from the fraud standard of evidence. *See, e.g., Vicksburg Furniture Mfg., Ltd. v. Aetna Casualty & Surety Co.,* 625 F.2d 1167, 1169 (5th Cir. 1980) (Miss. law); *Honeycutt v. Aetna Ins. Co.,* 510 F.2d 340, 349 (7th Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975) (Ill. law); *Connecticut Fire Ins. Co. v. Fox,* 361 F.2d 1, 6 (10th Cir. 1966) (Wyo. law); *J & H Auto Trim Co. v. Bellefonte Ins. Co.,* 501 F.Supp. 942, 960 (M.D.Fla.1980) *rev'd on other grounds,* 677 F.2d 1365 (11th Cir. 1982); *Godwin v. Farmers Ins. Co. of Am.,* 129 Ariz. 416, 631 P.2d 571, 573–74 (1981); *MFA Mutual Ins. Co. v. Pearrow,* 245 Ark. 795, 434 S.W.2d 269, 272–73 (1968); *Klayman v. Aetna Casualty & Surety Co.,* 501 P.2d 750, 752 (Colo.App.1972); *Werner's Furniture, Inc. v. Commercial Union Ins. Co.,* 39 Ill.App.3d 59, 349 N.E.2d 616, 620–21 (1976); *Osvaldo Varane, Inc. v. Liberty Mutual Ins. Co.,* 362 Mass. 864, 284 N.E.2d 923, 924 (1972); *George v. Travelers Indemnity Co.,* 81 Mich.App. 106, 265 N.W.2d 59, 62 (1978); *Quast v. Prudential Property & Casualty Co.,* 267 N.W.2d 493, 495 (Minn.1978); *Pacific Ins. Co. of N.Y. v. Frank,* 452 P.2d 794, 706 (Okl. 1969); *Greenberg v. Aetna Ins. Co.,* 427 Pa. 494, 235 A.2d 582, 583–84 (1967); *Raphtis v. St. Paul Fire & Marine Ins. Co.,* 198 N.W.2d 505, 507 (1972); *Great American Ins. Co. v. K & W Log, Inc.,* 22 Wash.App. 468, 591 P.2d 457, 459–60 (1979); 22A J. Appleman, *Insurance Law and Practice* § 13876 (1979); 19 *Couch on Insurance* § 79:473 (2d ed. 1968). *But see Carpenter v. Union Ins. Soc. of Canton, Ltd.,* 284 F.2d 155, 162 (4th Cir. 1960); *Jonas v. Northeastern Mutual Fire Ins. Co.,* 44 Wis.2d 347, 171 N.W.2d 185, 187 n.1 (1969).

he named the bartender who held the key as David DiCarlo. None of those three were witnesses at the trial. Demyan, in his testimony, did not mention Harold Coyle, the other bartender.

Harold Coyle was called as a witness for the plaintiff at the trial. He also tended bar and did catering jobs. He testified that it was he who went around the building at closing time on the early morning of the 8th January 1980 and he checked all the doors to the premises, turned off the lights, inside and in the parking lot, cleaned up the bar and swept up and about 3 A.M. he left with David DiCarlo, the other bartender, through the bar-room front door which they locked from the outside. They set the switch to the burglar alarm located on the outside of the door jamb. The first of the firemen who arrived on the scene testified that the front door was locked when he got there.

Coyle testified that when he left everything was in order in the premises, they were locked tight, there was no sign of fire anywhere. The only persons who had access to the premises were the Demyans and the employees named. John Demyan testified that he had taken the precaution to change the locks in the building twice a year since each bartender who closed up for him was issued a key. Coyle had been employed for about three years and DiCarlo had been an employee for a period of nine years.

John Demyan testified that at about five o'clock in the morning on January 8, 1980 he received a call from police who informed him of a fire at the Hofbrau. He dressed and rushed down to the restaurant, arriving at about a quarter after five. He testified that when he arrived he heard the burglar alarm ringing and "immediately ran to the front door", "the key to the alarm is on the outside, I wanted to turn it off" "I just went up to the door to turn the alarm off". He did not know why he wanted to shut the alarm off; that was just the way he reacted.

No one else who was at the scene at the time mentioned anything about hearing an alarm sounding or corroborated Demyan's testimony of an alarm sounding. The front door was still locked, unforced, when Demyan says he arrived there. The firemen made no mention in their testimony or in their departmental reports of hearing a burglar alarm sounding. Seemingly, an activated alarm would imply that someone without a key or without knowledge of how to quiet the alarm system had gained access to the premises during the night.

John Demyan's mention of a burglar alarm turned vague and contradictory as his testimony progressed. In direct examination he stated that the alarm had been activated before he got there and that he had been able to turn off the alarm. On cross-examination he ventured that perhaps the firemen had activated the alarm when they forced the doors. On re-direct examination, however, he admitted that he had not shut off any alarm, that the alarm noise had continued on albeit he had gone to the front door (where the burglar alarm switch was located) to shut the noise off as soon as he had arrived at the scene. On further questioning Demyan fell back on the statement that he could not tell if the sound he had heard was from the burglar alarm or rather was from the fire bell which was activated by and connected to the sprinkler system.

The burglar alarm at the Hofbrau was an automatic dialer, which was set up to call Patricia Demyan, as well as the police, in the event of a break-in. Though she testified that she was at home the night of the fire, she did not receive a call from the automatic dialer. No one testified that the police had or had not received a call from the automatic dialer at any time, either before or after the firemen arrived.

The fireman who arrived with the first due company and whose job it was to force open the doors testified that all those he tried were locked. There were no signs of forced or unauthorized entry into the Hofbrau building during the night or the morning of the fire.

The exclusive opportunity to enter the Hofbrau building was with those who had

access thereto with the keys; others lacked this opportunity and would have had to make a forcible entry to get in. No admissions or evidence placed any of the holders of the keys at the Hofbrau after it had been closed up for the night. John Demyan claimed that he had left the premises at about 11 P.M. on the 7th of January while Patricia Demyan testified that she was at home that night. Coyle and DiCarlo closed up at about 3 A.M. The others named as key holders did not testify.

*Motive*

The evidence shows that Demyan's Hofbrau, Inc. had steadily been losing ground in the two or three years before the fire; its custom and earnings were diminishing and it conceivably was reaching the point where the business was no longer profitable enough to be continued. It had been experiencing financial stringency for quite some time. John's brother, Frank, died unexpectedly in October 1978, raising the problem of settling with his estate for Frank's half-interest in Demyan's Hofbrau and Demyan's Realty, for which there was no money to pay. The 100 year old building was assessed in 1979 for only $32,500 by the City (admittedly considerably below the theoretical market value, although no bidder for the premises was obtained in 1978–79 when the premises were listed for sale). In a statement to a Fire Marshal after the blaze, John Demyan had stated that the pre-fire value of the contents of the building was $100,000.

There is no evidence that any other person had any motive to set the Hofbrau on fire. John Demyan testified that he had no problems with his employees, tenants or neighbors. He told fire investigators after the fire that he had no reason to believe anybody would set a fire in the Hofbrau.

John Demyan steadfastly denied that either he or anyone connected with the owners shared any complicity in the firing of the premises. He maintained at trial that the Hofbrau's business had remained relatively constant over the years; however, the evidence to the contrary shows that there was a substantial decline in the earnings, cash flow and customers in the period prior to the fire. During the same period, there was a substantial increase in the financial burdens faced by the Hofbrau.

A detailed reconstruction of the Hofbrau's financial picture has been hindered by the unexplained failure to salvage corporate records from the Hofbrau's office, which sustained only water, not fire damage. Patricia Demyan, who handled the books, testified that she had retrieved only the Hofbrau's checkbook, though she conceded that she had the opportunity to recover other records. As a result, at least the date books, which contained the records of the catering done by the Hofbrau, as well as the checkbooks for an account at Chemical Bank which could have shed light on the course of the Hofbrau's finances, were not produced at trial.

There was evidence that the paintings located in the premises were retrieved by John Demyan and that the circular bar was dismantled and located nearby. No evidence was adduced concerning the disposition of the personalty that was not damaged by the fire or located in places in the four story, multiple room structure, other than where the fires had taken hold. The evidence gave no clue as to what disposition was made of the undamaged personalty.

A closer look at the financial situation during the few years before and up to the fire gives every suggestion of an enterprise going out of business either voluntarily or involuntarily.

The Hofbrau had not operated satisfactorily or profitably for several years prior to the fire. As demonstrated by its tax returns, the Hofbrau sustained a taxable loss for the four fiscal years ending April 30, 1978. In fiscal year 1975, the business sustained a taxable loss of $1,069. This loss jumped to $12,816 in fiscal year 1976, there was a gain of $5,123 in fiscal year 1977 and a further loss of $3,371 in fiscal year 1978. In 1979, the principals ceased drawing the weekly salaries theretofore taken.

There is also evidence to suggest that plaintiff was permitting the Hofbrau's

physical plant to deteriorate in order to save on costs of maintenance and repair. John Demyan testified, without any back-up data to support his statements satisfactorily, that he spent $65,000 in 1965 to remodel rooms, $70,000 in 1966, and $20,000 in 1970. At any event, since then, the only significant renovation during the next nine years that he noted was the addition of a new tile floor to the barroom for a cost of $7,500. Moreover, the Hofbrau's deductions for depreciation on its federal tax returns dropped sharply from $19,094 in fiscal year 1975 to $2,235 in fiscal year 1976, $2,104 in fiscal year 1977 and $2,118 in fiscal year 1978.

Clearly, Demyan's Hofbrau, Inc. was being squeezed by strong financial pressures which increased steadily until the fire served effectively to massively damage the corporation's major asset and bring on the decision for the entire cessation of the catering, restaurant and bar business; no effort was made to take the Hofbrau back into business after the fire damage occurred. In further detail (although possibly repetitive) the chronology looks somewhat as follows:

*Summer 1977:*

Following an electrical blackout, John Demyan applied for a $30,000 loan from the SBA, alleging financial difficulties as a result of a spoilage loss caused by an interruption in refrigeration. Demyan testified that at the time he made the loan application, the Hofbrau was "hard pressed" financially. The business had never had a large cash surplus, and the spoilage loss caused cash flow stringency. The loan application was denied.

Ten months after the fire, John Demyan was indicted and convicted of filing fraudulent misstatements in connection with this SBA application; he had obtained blank specimen invoices from suppliers which were fraudulently filled in.

*December 1977:*

The Hofbrau fell behind on the $347 a month payments required by a loan obtained from the SBA in 1970 and 1971.

When an investigator appeared for the SBA, Demyan explained that he was in arrears because business had declined. This, he said, was due to two factors: 1) New Jersey had lowered its drinking age (thereby removing the necessity for teenagers from that state to travel to adjacent Staten Island to drink) and 2) the shipping companies, whose executives often ate lunch at the Hofbrau, had moved from Staten Island.

Because of this, the number of lunches the Hofbrau served daily had declined from 150 to 40.

In a personal financial statement submitted at the same time, Demyan claimed that his assets exceeded his liabilities by $116,000, and that the value of the real estate he owned was the value of his home, $80,000.

*January 1978:*

John Demyan made another application for a loan from the SBA, this time for $14,400, which also was denied.

*June 1978:*

John Demyan borrowed $25,000 for the Hofbrau from the Gateway National Bank, to be paid back at the rate of $824 a month. The bank required that Demyan personally guarantee the loan.

*October 1, 1978:*

John Demyan's brother, Frank, died. Frank Demyan owned half of Demyan's Hofbrau, Inc. and Demyan's Realty, Inc. He had worked nights at the restaurant and Mr. Sgroi, the Hofbrau's accountant, suggested that Frank Demyan's death was one of the reasons why the Hofbrau's sales declined in 1979.

Soon after his brother died, John Demyan listed the Hofbrau for sale with a Staten Island real estate firm, but received no inquiries or bids therefor. Out of the proceeds of the insurance on his brother's life, John Demyan received $58,000 and gave his sister-in-law Patricia $25,000. The amount due to Frank Demyan's estate for his interests in the Hofbrau and the real estate could not be paid.

*Third Quarter 1979:*

As evidenced by the payroll tax returns, the Hofbrau's payroll slumped $1,300 to $8,850 for the third quarter, 1979.

*December 1978:*

The Hofbrau again falls into arrears on the 1970/71 SBA loan.

*July—September 1979:*

Patricia Demyan went off the payroll so far as the weekly drawing previously paid to her deceased husband. John Demyan did not draw any salary from the Hofbrau by check, though he had customarily drawn $230 a week. On August 27, 1979, he submitted a form to the SBA in which he stated that he took home $150 a week, presumably in cash.

*August 1, 1979:*

John Demyan made a payment of three years of back business taxes for the Hofbrau of nearly $26,750, using the recent proceeds he had obtained from the sale of a house he had inherited from his parents.

*August 27, 1979:*

John Demyan told an SBA official investigating the arrears on his 1970/71 loan that "business was bad and they were unable to make payments." In supplying the official with financial information, Demyan stated that his sales were "low", that they were not providing a profit, and that he had debts that were past due.

*September 28, 1979:*

John Demyan obtained a loan from the Borg-Warner Finance Co. to pay the fire insurance premium on the Hofbrau.

*December 1979:*

The Hofbrau was burglarized and $3,200 in cash was stolen.

*December 28, 1979:*

Notice was mailed to Demyan by Borg-Warner Finance Co. that he is in default on the loan for the insurance premium and that the insurance will be cancelled effective January 9, 1980 on the Hofbrau.

At the time of the fire, the Hofbrau owed more than $14,000 to utilities and suppliers. The State claimed that the Hofbrau additionally owed $42,767 in back sales taxes for the period October 1, 1975 to April 10, 1978. This figure, disputed at the time, was later compromised at $22,186 plus interest. Moreover, there were still some $8,000 outstanding on the loan obtained in 1978 from the Gateway Bank, as well as approximately $17,000 outstanding on the 1970/71 SBA loan, of which $4,511 was in arrears.

Against these burdens, the Hofbrau's commercial bank account, less outstanding checks, contained $4,552.96. That the business' cash flow situation was dire is evidenced by the fact that the Hofbrau's bank account had been overdrawn on more than three occasions in the ninety days previous to the fire, once for more than $2,400. On another occasion, in early November, a total of five checks were returned by the bank because the account was overdrawn. Indeed, as late as December 26 two checks were returned for insufficient funds. The Hofbrau's cash flow was not likely to improve, since, as its accountant testified, sales were running at a rate 8–9 percent below those of the year before.

The obligation under a 1965 buy-sell agreement between the brothers to pay off Frank Demyan's estate for the latter's half-share of the companies, gave rise to a substantial liability in 1978 and remained unpaid and unpayable at the time of the fire. There were insufficient liquid assets in the businesses and in John Demyan's possession with which to pay off the debt.

In December 1965 John and Frank Demyan had executed a buy-sell agreement which covered their relationships as co-owners of Demyan's Hofbrau, Inc. and Demyan's Realty, Inc. According to the agreement, each brother was to procure $85,000 of insurance on the other's life, with the premiums to be paid by the corporations. Clause 6(a) of the agreement provided that, at the time of either brother's death, the insurance proceeds were to be collected by the surviving brother and paid over to the deceased's legal representative in partial payment for his share of the companies. Clause 6(b) obligated the survivor to pay the difference between the amount realized from the insurance and the

value of the half share owned by the estate.[2]

When Frank Demyan died in 1978, there was only $50,000 worth of insurance on his life remaining in force, plus accrued interest and dividends. However, out of the proceeds of approximately $58,000 John Demyan paid only $25,000 to Patricia Demyan, Frank's widow and executrix. He called this payment a "gift" in his testimony. Sometime in 1981, John Demyan memorialized an agreement reached with Patricia Demyan that he owed her an additional $100,000 for the estate's share of the two corporations. Only $5,000 was paid on account of that debt. The widow has received $1,000 a month as "interest" on the debt from April 1981 until the present day.

Taking account of the fact that the buy-sell transaction may not have been a truly arm's length bargain, John Demyan's acknowledgment that he owed his sister-in-law a total of $125,000 over-all for Frank Demyan's 50% interests, in lieu of the 1965 buy-sell agreement, still suggests that 100% of the combined assets of Demyan's Hofbrau and Demyan's Realty were not worth more than $250,000 at the time of the fire, far less than the $450,000 of fire insurance placed in 1979 on the Hofbrau building and its contents, alone. Even if, as John Demyan testified, the $100,000 was intended to be "[p]ayment for a possible sale of one-half portion of the commercial property which is two buildings," so that the $100,000 did not properly represent the entire value of Frank Demyan's half-share of both corporations, a debt of that size due to Frank's widow presented an impossibility of payment when and as required by the agreement, was certain to be a massive drain on the Hofbrau's already tight cash flow.

*Summary*

The picture of Demyan's Hofbrau, Inc. presented by the evidence was that of a business beleaguered by serious financial difficulties for more than a few years and then hobbled by the death of one of its principals and confronted with massive accumulated business and sales tax liabilities asserted by the State. Nothing John Demyan tried to do to cut costs, including delaying payment on the Hofbrau's debts, reducing expenditures for maintenance and upkeep, and defaulting on the SBA loan, was effective in turning the business around.

The Hofbrau's impaired and failing fortunes, combined with the fact that only the Demyans and their employees had access to the premises, the fact that someone having familiarity with the building and possession of the keys was responsible for the two or three separate and separated points of origin of the fire caused by flammable liquids and accelerants placed at the widely separated points in the building and the fact that only the Demyans and plaintiff were shown to have had any motive for arson to seek relief by way of collecting on the insurance, are sufficient circumstantially to warrant the inference and finding that the arson fire was attributable to the assured. The preponderance of the credible evidence weighs in favor of the defendant's defense that the fires, of non-accidental, incendiary origin were induced or caused by the assured, its principals, agents or servants or that they were implicated therein.

Accordingly, it is concluded that the defendant is not liable to the plaintiff herein and the complaint is dismissed, with costs.

The foregoing, together with the Court's interim findings made at the conclusion of the presentation of the evidence, shall constitute the findings of fact and conclusions of law required by Federal Rules of Civil Procedure, 52(a).

SO ORDERED.

---

**2.** The obligation was payable by monthly notes of $625 with 4% interest. On default in pay- ment of any note all became immediately due.