780 P.2d 116

**Wilford PACHECO, Plaintiff–Appellant,**

v.

**SAFECO INSURANCE COMPANY OF AMERICA, Defendant–Respondent.**

**No. 16993.**

Supreme Court of Idaho.

July 21, 1989.

Rehearing Denied Oct. 18, 1989.*

---

* Dissenting opinion on denial of rehearing will be published.

Webb, Burton, Carlson, Pedersen & Webb, Twin Falls, and John B. Kugler Law Offices, Pocatello, for plaintiff-appellant. John B. Kugler and Lloyd J. Webb argued.

Wood, Stephens & Telford, Idaho Falls, for defendant-respondent. Alan C. Stephens argued.

HUNTLEY, Justice.

Pacheco filed suit against Safeco for bad faith denial of his claim for fire insurance proceeds. Safeco defended, contending that Pacheco was responsible for intentionally setting the fire. The jury found for Safeco. Pacheco filed a motion for judgment notwithstanding the verdict, which was denied by the court. Pacheco appeals on evidentiary and other grounds.

On January 2, 1986, at approximately 3:45 a.m. an arson fire caused over $200,000 worth of damage to Wilford Benito Pacheco's dental office in American Falls, Idaho. On the day before the fire, Pacheco closed his office and removed several boxes

of supplies and at least two paintings and took them home where he stored them in his family room. Pacheco treated a patient at his office that night and was in his office until 9:00 p.m.

Pacheco's truck was seen across the street from his dental office at about 1:30 or 2:00 a.m. on January 2, 1986. As noted, the fire occurred at 3:45 a.m. The authorities determined that the fire was caused by an arsonist who poured accelerant through a hole which had been cut from Pacheco's side of the building through the adjoining wall of the next door business offices. Gasoline and diesel fuel were found on the premises and gas cans matching the description of gas cans owned by Pacheco were found at the fire scene. After the fire, Pacheco filed an insurance claim with his fire insurance carrier, Safeco, which denied coverage.

Pacheco filed a complaint for recovery under the policy, for the loss, for other damages (including a bad faith refusal to insure, emotional distress and defamation), for attorney fees and for punitive damages. Safeco answered denying Pacheco's claims and raised the following affirmative defenses: since Pacheco had intentionally set the fire, Safeco had no contractual obligation to pay; or, in the alternative, public policy would estop Pacheco from obtaining payment under the circumstances. On January 5, 1987, the court granted Safeco's motion for summary judgment on Pacheco's claims for punitive damages and emotional distress. On February 13, 1987, the court granted Safeco's motion for summary judgment on Pacheco's claim for defamation but refused to grant summary judgment on the bad faith claim stating that *White v. Unigard Mut. Ins. Co.*, 112 Idaho 94, 730 P.2d 1014 (1986) was applicable and based on that opinion it would consider Pacheco's claim of bad faith to be an issue for trial even though it would not amend its judgment dismissing punitive damages. The court noted that the threshold level of proof was somewhat less for bad faith than for punitive damages.

At trial, Pacheco presented testimony that his insurance coverage of $189,000 was less than the loss he sustained in the fire. A witness for Pacheco testified that Pacheco would not have set the fire himself because he had hanging in his office a painting of a fawn drinking from a stream that was given to him by a dying patient. That "sentimental painting" showed up in evidence in a photograph taken by police of the items discovered in the basement of Pacheco's house a few days after the fire.

Safeco presented testimony that Pacheco had been in financial straits prior to the fire. Safeco also presented evidence that the day after the fire Pacheco went to IB & T in American Falls and paid two delinquent IB & T loans with a check dated December 29th, but which had a numerical sequence number that followed the numbering on checks he had written on December 31, 1985.

John Olmsted, "senior investigator" for the Idaho Investigative Service Bureau, was the primary witness testifying in support of Safeco's defense that Pacheco set the fire. Over Pacheco's objection, the trial court permitted Olmsted to testify about his investigation of the fire and opinions he reached during that investigation. Ultimately, the court permitted Olmsted to testify that he considered the "chief suspects" in the arson investigation to be Pacheco and his wife. Pacheco moved for a mistrial and the trial court denied his motion. Olmsted then testified that it would be his duty to charge a person with arson if he believed that he had an adequate case against that person. At the time of the trial no one had been arrested or charged with any crime in connection with the fire. Safeco was also permitted to introduce evidence that Pacheco had sustained a fire loss in 1982. This evidence was received over strenuous objection.

After the parties presented their evidence, Pacheco requested that the trial court instruct the jury that each of the elements of Safeco's defense must be proven by clear and convincing evidence. The trial court did not adopt this requested instruction but instead instructed the jury that they need only find the elements of

798

Safeco's defense by a preponderance of the evidence.

Pacheco also submitted two proposed instructions relating to circumstantial evidence. One instruction would have suggested to the jury that circumstantial evidence must be something more than that which casts a suspicion on the plaintiff. The other instruction would have suggested that Pacheco could not be found culpable if the circumstantial evidence was equally susceptible of the opposite conclusion. Ultimately, the court refused both proposals and instead used the standard IDJI instruction on the differences between direct and circumstantial evidence. The jury found for Safeco. Pacheco appeals claiming that the court erred in admitting the criminal investigator's testimony, evidence of the criminal investigation, evidence of a previous fire and Pacheco's financial status. Pacheco also alleges reversible error in the standard of proof utilized, jury instructions and juror misconduct.

## I.

### Admission of The Criminal Investigator's Testimony

Pacheco first claims that the trial court erred in allowing the criminal investigator to testify as to the identity of his prime suspects and as to his opinion that Pacheco set the fires. He argues that this testimony was irrelevant and highly prejudicial in that it created an improper implication of criminal guilt to permeate a civil trial (*State v. Owens*, 101 Idaho 632, 639, 619 P.2d 787, 794, (1980)); it was incompetent (*Fowler–Barham Ford v. Indiana Lumbermens Mutual*, 45 N.C.App. 625, 263 S.E.2d 825, 828–29 (1980); and that it permitted a witness to give a legal conclusion. Pacheco also argues that it was inappropriate for the trial court to permit the investigator to refer to a search warrant issued against Pacheco's residence in the course of the criminal investigation concerning the fire, arguing that the fact that Pacheco never was actually arrested did not lessen the impact of this improperly admitted evidence. Prior to addressing the issues

raised by Pacheco, we discuss the standard of appellate review.

■ Pacheco is required to show more than error; he must show prejudicial error. Otherwise, any error below will be presumed harmless. *Viehweg v. Thompson*, 103 Idaho 265, 269, 647 P.2d 311, 315 (Ct. App.1982). Prejudice will not be presumed on appeal. *See Boise Dodge Inc. v. Clark*, 92 Idaho 902, 909, 453 P.2d 551, 558 (1969). Where the issue is the admission of improper evidence, such admission will be considered harmless if there is other competent evidence to the same effect upon which a jury could reach the same result. *Idaho First National Bank v. Wells*, 100 Idaho 256, 262, 596 P.2d 429, 435 (1979).

■ Here there was ample circumstantial and testimonial evidence, other than the criminal investigator's testimony, that had the same effect and could have led the jury to the same result. This evidence includes: (1) The hole in Pacheco's wall through which the accelerant was poured; (2) Pacheco's financial situation; (3) the discovery of his gas cans across the street from the smoldering remains of his office; (4) Pacheco's closing of his office the day before the fire; (5) Pacheco's removal of various valuable and sentimental items from his office the day before the fire; and, (6) the pre-dated check tendered after the fire.

■ In addition to there being no prejudicial error, admission of the investigator's testimony also complied with the requirements of Idaho Rules of Evidence 702, 703, 704 and 705 in that he carefully described the evidence relied upon when he stated his opinion as to the cause of the fire.

■ Furthermore, Olmsted's testimony was critical to the issue of whether Safeco acted in bad faith. The law defining "bad faith," in cases such as this was established in *White v. Unigard Mut. Ins. Co.*, 112 Idaho 94, 730 P.2d 1014 (1986) which was decided about one-and-a-half months before the trial began. Therefore, when the case was tried, Safeco had to assume that the rule stated in *White* pertained. That rule is:

... the mere failing to immediately settle what later proves to be a valid claim does not of itself establish 'bad faith.' ... [t]he insured must show the insurer 'intentionally and unreasonably denies or delays payment....' (Citation omitted). An insurer does not act in bad faith when it challenges the validity of a 'fairly debatable' claim, or when its delay results from honest mistakes. (Citations omitted).

112 Idaho at 100, 730 P.2d at 1020.

Safeco's counsel foresaw the potential conflict that could arise by having to present evidence necessary to the issue of who set the fire and evidence necessary to the question of bad faith or punitive damages in the same trial. Therefore, on October 2, 1986, Safeco moved for bifurcation of the trial, asking that its affirmative defense be tried prior to and separate from the plaintiff's complaint. This would have prevented the jury from having the criminal investigator's testimony in the same case that Pacheco had to show the insurer "intentionally and unreasonably denied payment." The motion was resisted by Pacheco, and it was denied.

After the close of Pacheco's case in chief, Safeco moved for a directed verdict on the bad faith claim because Pacheco had not addressed the issue of whether Safeco's failure to pay was unreasonable under the circumstances. Pacheco objected to Safeco's motion and the court denied the motion. Therefore, when Safeco defended, it had to show not only that Pacheco was responsible for the fire, but it also had to explain to the jury what information Safeco had (including the investigator's report) which caused Safeco to refuse payment of Pacheco's claim. As a result, even if the opinion evidence were inadmissible, it is actually Pacheco who was responsible for it going before the jury.

## II.

### Evidence of the Criminal Investigation

■ In addition to claiming that the court erred in admitting the criminal investigator's testimony, Pacheco also claims the court erred in admitting evidence of the criminal investigation. In particular, Pacheco claims the court erred when it admitted testimony pertaining to items of evidence which had been removed from Pacheco's office prior to the fire and were found in his basement in the course of a search pursuant to a warrant. Regarding the search warrant, it was Pacheco who originally introduced evidence of the search warrant and when Safeco later presented evidence of the search warrant Pacheco did not object. Pacheco did not request that the term "search warrant" and Pacheco's counsel's reference to the "search warrant" throughout the trial be stricken from the record. Hence, any possible error was invited and not preserved by objection.

## III.

### Evidence of the 1982 Fire at Pacheco's Prior Dental Office

■ Pacheco next argues that the trial court erred in admitting evidence of an arson investigation involving Pacheco following a fire in 1982. This evidence was admitted despite the fact that Pacheco's involvement in the other fire was never established. Pacheco argues that case law provides that evidence of other criminal conduct will not be received as indicative of the commission of a particular act charged, whether in the context of a criminal case, or of a civil case. *See e.g., Curtis v. Western Reporting and Credit Co.*, 39 Idaho 784, 787, 230 P. 771, 774 (1924) (in an action on a promissory note, where usury is pleaded as evidence with respect to other alleged usurious transactions is not admissible). In a case upon a claim of fire loss, evidence of other fires will not be admitted unless it can be established that the claimant was connected with starting those other fires. *Hawks v. Northwestern Mutual Ins. Co.*, 93 Idaho 381, 383–383, 461 P.2d 721, 723–723 (1969); *Boise Association of Credit Men, Ltd. v. United States Fire Ins. Co.*, 44 Idaho 249, 259–261, 256 P. 523, 533–535 (1927).

■ We need not address Pacheco's analysis of the law because evidence of the 1982 fire was originally introduced by Pa-

checo in his case in chief. Later, Pacheco agreed that the evidence could come in under Safeco's defense to the bad faith claim. Once that evidence was introduced by Pacheco, then the prohibition of the rule of law in the cases cited by Pacheco did not apply. Therefore, the evidence was properly admitted. Safeco argues that this Court should change the law pertaining to this issue, as cited by Pacheco, and opt for the "better rule" as expressed by the court in *Rutledge v. St. Paul Fire & Marine Ins. Co.*, 286 S.C. 360, 334 S.E.2d 131, 137 (App. 1985) in which the court stated:

> Still, we think the better rule is that evidence of another fire and of settlement arising therefrom is relevant to the issues of the insured's intent, motive and knowledge irrespective of whether the other fire was incendiary.

Safeco argues that the courts should allow evidence of prior fires in civil arson cases without requiring evidence that the insured set them. Safeco fails to present any compelling reason to change the law as it now exists in Idaho. The reasoning in *St. Paul Fire & Marine Ins. Co.* is unpersuasive. The point that evidence of a prior fire may be indicative of motive and/or intent in a later fire, regardless of whether it was even proven that the first fire was set by an arsonist, is particularly unpersuasive. We adhere to the opinion that such evidence is both legally and logically irrelevant.

## IV.

### Admission of Testimony That Pacheco Was in Debt

Pacheco argues that the financial circumstances of a party to an action are immaterial and irrelevant, *Meagher v. Garvin*, 391 P.2d 507, 511–512 (Nev.1964). He also argues that case law indicating that proof of insolvency can be relevant to motive in the fire insurance claim context runs contrary to this basic rule of evidence. Pacheco claims that he had a thriving practice and that he was, in fact, underinsured. Thus, the evidence of his alleged insolvency was incorrect, as well as being totally irrelevant and highly prejudicial. In cases such

as this, where the insurance company refuses to pay an insurance claim on the ground that the claimant was an incendiary, the company has the burden of showing, by a preponderance of evidence, that the claimant set the fire. The claimant's financial status is highly relevant to the issue of motive. *See Lawson v. State Farm Fire and Casualty Ins. Co.*, 41 Colo. App. 362, 585 P.2d 318 (1978). Therefore, the trial court did not err in admitting information concerning Pacheco's finances.

## V.

### The Standard of Proof Required for an Affirmative Defense on Refusal to Insure

Pacheco claims the trial court erred in instructing the jury that Safeco had to prove its affirmative defense (that Pacheco committed fraud) by a preponderance of the evidence rather than by clear and convincing evidence. Pacheco submitted appropriate instructions to the court for the application of the clear and convincing test, and asserts they were wrongly rejected. Pacheco cites *Smith v. King*, 100 Idaho 331, 334, 597 P.2d 217, 220 (1979) and *Carpenter v. Union Ins. Co.*, 284 F.2d 155, 162 (4th Cir.1960) in support of this contention.

The majority rule is that an insurance company must prove its affirmative defense for refusal to pay a fire claim by a preponderance of the evidence. *Godwin v. Farmers Ins. Co. of America*, 129 Ariz. 416, 418–19, 631 P.2d 571, 573–74 (1981). The trial court chose to follow the majority rule; it did not err. It should also be noted that although the original complaint alleged fraud, and fraud must be proven by clear and convincing evidence, the amended complaint (upon which the case was tried) did not allege fraud. The case was actually tried on a breach of contract theory, and breach of contract is proven by a preponderance of the evidence, not by clear and convincing evidence. The terms of the policy stated that the insurance company would not pay if someone burned his own property; the policy language clearly includes the defenses of dis-

honest and criminal acts in addition to the defense of fraud. Finally, public policy would not allow recovery under a contract of insurance where the insured started his own fire. In this case, the jury determined that Pacheco set the fire.

## VI.

### Jury Instructions on Circumstantial Evidence

Pacheco claims the trial court erred by failing to instruct the jury on the use of circumstantial evidence because the evidence of Pacheco's involvement in the fire was purely circumstantial. Pacheco concedes that the requirement that the jury be instructed on circumstantial evidence where it is the only evidence presented, was established in the context of a criminal prosecution (see *State v. Holder*, 100 Idaho 129, 132–33, 594 P.2d 639, 642–43 (1979), and is limited to criminal cases. He attempts to overcome this obstacle by arguing that while this is a civil case, he was charged with criminal activity and so the doctrine set forth in *Holder* should apply.

Pacheco's attempt to bootstrap the rules of criminal law to this case is unpersuasive. Mere references to a collateral criminal investigation do not magically change this civil action into a criminal prosecution.

Further, contrary to Pacheco's claim, there was, in fact, an instruction on circumstantial evidence. In Instruction No. 7 the court provided the standard IDJI instruction with regard to explaining the differences between direct and circumstantial evidence. Since this was not a criminal case and since the criminal rules do not apply in civil cases, the court correctly followed the civil jury instruction provided in IDJI.

## VII.

### Contact Between Jurors and Witnesses

Finally, Pacheco claims that the fact that one of the prosecution's witnesses gave a juror a three block ride in his car so prejudiced the determination of this case as to demand a new trial.

When jury misconduct is alleged, there must be a showing of prejudice. *Black v. Reynolds*, 109 Idaho 277, 707 P.2d 388 (1985). Here, no testimony was presented that the juror and the witness discussed the case. In any event, when the complaining party or his counsel know of the alleged jury misconduct before the verdict is returned but keep silent, any right to claim misconduct is waived. *Moore v. Adams*, 273 Or. 576, 542 P.2d 490 (1975). In this case, Pacheco has failed to show prejudice and further, his counsel knew of the alleged misconduct prior to the verdict but kept silent. The trial court properly exercised its discretion in ruling that the alleged misconduct did not prejudice the trial.

The verdict and judgment and post-trial orders of the trial court are in all respects affirmed.

Costs to respondent, no attorney fees awarded on appeal.

BAKES, C.J., and JOHNSON, J., concur.

SHEPARD, J., sat but did not participate due to his untimely death.

BISTLINE, Justice, dissenting.

## I.

One inescapable fact which does not appear in the majority opinion is that the verdict was not unanimous. Indeed, if there had been one less juror who would sign the verdict, there would have been no verdict. Nine signed, and nine is the bare requirement necessary to reach a verdict in Idaho civil law. The verdict was a special verdict consisting of a first question which called for a yes or no answer, "Did the Plaintiff Wilford Pacheco intentionally set the fire which caused his loss?" Only if the jury returned a "no" answer did it have any further questions to answer.

At the conclusion of the trial Safeco filed an extensive cost bill for expenses and attorney fees. It asked $2610.86 for expert witnesses called to testify in its behalf, listing nine such witnesses. This list of expert witnesses did not include a John Olmsted, an employee of the state of Idaho,

Department of Law Enforcement. This man would be an apparently voluntary witness upon whose testimony Safeco would base its defense in Pacheco's civil action to recover on his Safeco fire insurance policy. On the witness stand he would be allowed to state a conclusion which he drew as to the person responsible for the fire. Moreover, he would be allowed to include in his reasoning process much of which was clearly objectionable hearsay, and which was objected to.

The conclusion which he would state would be couched in supposedly nonprejudicial phraseology, but nevertheless it could not do otherwise but direct a verdict against the plaintiff Pacheco. Whereas Safeco's counsel wanted Mr. Olmsted to state his opinion that Pacheco was the culprit who torched his own property, the trial court in a faint exercise of judicial discretion announced at a colloquy between court and counsel taking place outside of the presence of the jury that, no, Olmsted cannot give that answer. The rationale for the court's ruling was that such an opinion would invade the province of the jury—which it most assuredly would have done. Nevertheless, that same opinion would nevertheless be presented to the jury, albeit couched in slightly different language.

The Court, succumbing to the persistent contentions of Safeco, allowed the witness to tell the jury his opinion as to the identity of the "chief suspect." "Suspect" as used here is a noun, and has but two accepted meanings, namely, "one who is suspected, especially, one who is suspected of a crime." Webster's Collegiate Dictionary. It has also found its way into Black's Law Dictionary, 5th ed., "[a] person reputed or suspected to be involved in a crime." Arson, of course, is a crime. To be designated a chief suspect is the equivalent of being designated the prime or most likely suspect. Twelve jurors could not help but know that they were hearing from a state officer that Pacheco was *it*, that *he* started the fire, that *he* was guilty of the crime of arson.

Moreover, as though so doing would somehow make it more palatable, the questions and answers eliciting this opinion in front of the jurors were couched not in telling the jury his opinion, but in relating the opinion he had delivered to a Safeco employee.

Keeping in mind that this conclusion so arrived at was painstakingly based on many bits of information, mostly hearsay statements of others, to which we will presently turn, here is the way the conclusion itself was dramatically brought forth to the jury:

Q And did you rely on this information in this conversation in coming to the opinion that I was just asking you about?

A Yes, I did.

Q Now, *did you* ever prior to April 7th, 1986, *tell Al Peterson what opinion you had formulated with regard to a chief suspect?*

A I'm sure that I did.

Q And what opinion did you arrive at with regard to a chief suspect?

MR. WEBB: And our objection should be noted for the reasons previously articulated, Your Honor.

THE COURT: The objection is noted. Sir, please answer the question.

A Can I explain it?

Q Just answer it.

A What was the question again.

Q *What opinion did you have as to who the chief suspect was that you would have relayed to Safeco Insurance?*

A *I would have relayed that the chief suspect was Wil and Patsy Pacheco.*

The plaintiffs' objection was perfunctory, just for the record. The court had previously ruled *in limine* that the Olmsted opinion pointing the finger of guilt at Pacheco could be stated to the jury. Moreover, irrespective of the other frailties attendant in allowing the Olmsted opinion fingering *both* Dr. and Mrs. Pacheco as the chief suspects, the *court itself discredited* the *Olmsted opinion* only insofar as Olmsted went so far overboard as to include Mrs. Pacheco as a chief suspect:

THE COURT: But I don't think based on Mr. Olmsted's investigation, at least what he testified to, that there is any implication with Mrs. Pacheco such to give him the foundation to give such an opinion as he did, even though obviously she's Dr. Pacheco's wife. She's certainly—just because she's his wife, she can't be painted with the same brush, you might say, that Mr. Olmsted attempted to paint Dr. Pacheco with. So that's what I'll do, Mr. Webb.

There will be some who will think that Mr. Olmsted in pointing the finger of guilt at Mrs. Pacheco, Mr. Olmsted believed himself helping Safeco's defense just that much more. (Even defense counsel admitted to being surprised by Olmsted's mention of Mrs. Pacheco.) As noted in the above excerpt, the court itself observed Olmsted as *attempting* to paint Pacheco with an implicitly prejudicial brush.[1] Quite apparently the court saw Mr. Olmsted in his zeal guilty of overkill.

Returning to the purported foundation which Olmsted attempted to tag as a predicate for his conclusion as to the joint complicity in crime of both Pacheco and his wife—because much of what took place is so unbelievable, it is best that the reader peruse it for himself. Accordingly it will be found attached hereto as Appendix A.

Summarizing the context of Appendix A, it is readily apparent that Safeco counsel was highly over-persistent in his contentions that he be allowed to have the Safeco expert witness Olmsted tell the jurors what other persons—none of whom had yet testified as witnesses in the cause—had said to him. Pacheco's valid objections went for naught. Over a long period of time in the early and formulative part of the trial the jurors were fed a steady diet of hearsay, all of which was pointed in the direction of cumulatively substantiating Olmsted's expert opinion that Dr. and Mrs. Pacheco were the prime suspects (and no other suspects were mentioned) of the *crime of ar-*

*son.* Not only was Safeco's counsel overly persistent with his improper direct examination, but he was overly successful. The trial judge, reputedly one of the very best in southern Idaho, and one who had extensive experience as a trial attorney, was simply overwhelmed by the bombastic argument directed at him by Safeco's counsel.

Eventually, but only after the damage was done, great and not erasable in the eyes of any trial attorney of even limited experience, the trial court realized that too much leniency had been extended. After the jury was sent out, the trial court conceded his genuine concern in *continuing* to allow Olmsted to relate to the jury what others had told him. By that time, unfortunately, over strenuous objection the court had allowed the jury to hear from Olmsted what he remembered and understood having heard from six or seven persons who presumably were not under oath in answering Olmsted's questions. Even when the court announced its misgivings, Safeco still urged upon the court time and time again that when an *expert* is gathering such information, [t]he fact that it is hearsay is meaningless with regard to opinion testimony." Appendix A, at 818, 780 P.2d at 140.

Counsel for Pacheco stated his position with the admonition that: The juries hear it, and even if someone else testifies to the truth and it comes out differently they still have heard the version that Olmsted offers to them.

Testimony given under oath early in the trial which repeats unsworn statements of others might not have much impact upon a jury comprised of attorneys, true enough. But where the jury is made up of lay people, 95% of whom will have no conception of hearsay and its fallacies, the jurors can hardly be expected to unring the bell. Such improper testimony would be more damaging than counsel's opening statement as to what his witnesses will say and his closing statement as to what they did

1. The court's remark was made in the court in considering a Pacheco motion for mistrial directed at the error in allowing the Olmsted

opinion. A point argued was that Olmsted had discredited Mrs. Pacheco in the eyes of the jurors.

say. Jurors are advised that the testimony of witnesses is what matters—not what counsel tells them. And, Mr. Olmsted *was* a witness.

Finally, as to this pernicious evidentiary problem, the trial court reached the correct conclusion:

> THE COURT: I agree, Mr. Stephens, I agree with Mr. Webb. It looks to me like these witnesses should have been called first and advise the jury what they told Officer Olmsted. That would be admissible, of course. *But we're doing it, it looks to me, backwards,* and I am somewhat bothered by this procedure. And I'm not being critical of you, I know you have scheduling problems with witnesses.

It cannot seriously be contended or argued otherwise than at this juncture the trial should have been aborted, and a new trial scheduled. It is inescapable that the jury would have been at that time irreparably prejudiced against Dr. Pacheco. Others might differ, but if they do one can wonder as to the extent of their jury trial experience.

## II.

There are some serious misconceptions in the majority opinion. At 799, 780 P.2d at 121: "Even if the opinion evidence (of Olmsted) were inadmissible,[2] it is actually Pacheco who was responsible for it going before the jury." This strange twist of logic is said to result from Pacheco's resistance to a Safeco motion to dismiss Pacheco's bad faith claim, thereby causing Safeco to lay before the jury the information which Olmsted's opinion had relayed to Safeco as supposed justification for not paying the insurance claim. This borders on the

ridiculous. Any plaintiff filing a claim or multiple claims will naturally resist a dismissal motion.

Then, at 799, 780 P.2d at 121 the majority opinion goes as far afield as it has been my experience to witness:

> Safeco's counsel foresaw the potential conflict that could arise by having to present evidence necessary to the issue of who set the fire and evidence necessary to the question of bad faith or punitive damages in the same trial. Therefore, on October 2, 1986, Safeco moved for bifurcation of the trial, asking that its affirmative defense be tried prior to and separate from the plaintiff's complaint.

There is nothing laudable in those two sentences. A plaintiff has the right to control the presentation of his own case. The statement is worded as though Safeco was extending a courtesy to plaintiff in so moving to bifurcate. This is ludicrous, and is another sign of mid-summer madness in appellate court opinion writing—which perhaps we all suffer from in protecting the illustrious image which the Court administrator has declared, with the various chief justices repeating in prepared speeches. To the contrary, Safeco's motion was not made in order to benefit the plaintiff, but to benefit Safeco by letting it put on its case before plaintiff had laid out any case. Rule 42(b), captioned "Separate Trials", is indeed in the opening lines couched in the terms of Safeco's motion, i.e. convenience, expedition, and economy and avoidance of prejudice. But what it does not mention is any authority in a district court to order bifurcation of a plaintiff's case from the defense's case, and certainly the rule makes not the slightest intimation that the defense may be allowed to present its case ahead of the plaintiff's case.[3]

**2.** This would appear to be tantamount to conceding the inadmissibility of an Olmsted opinion which went to the heart of the issue which would be for the jury to decide, not Olmsted. To say, "*Even if* the opinion evidence (of Olmsted) were inadmissible, it is actually Pacheco who was responsible for it going before the jury" *is* like damning with faint praise. The opinion was either admissible or inadmissible, and as eventually ruled by the trial court, "these witnesses should have been called." It was for

the jury to draw any conclusion as to the cause of the fire which the evidence, entirely circumstantial, would substantiate. Olmsted's opinion testimony naming Dr. Pacheco as a prime suspect was as devastating as any trial attorney can ever hope to never encounter.

**3.** Rule 42(b) in full reads: **Separate trials.**—The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a

A horse is a horse is a horse, and a trial likewise is a trial. At trial a plaintiff puts on his case of liability and damages, following which the defendant can do the same, bringing in his evidence on liability and damages. There probably are instances where those two issues have been bifurcated, just as now it is well-established that in potential death penalty cases the issue of guilt or innocence is tried first and separately, and a separate hearing is held as to the imposition of punishment. But, in essence it is one trial broken down into stages, with one stage flowing logically from other.

Safeco filed a brief in support of its motion seeking leave of court to present its defense even before plaintiff put on any case, but it cited no Idaho case for that novel procedural concept. Mostly what Safeco's motion and brief ignores is that "trials" of a *defense* are not mentioned in Rule 42(b); *bifurcation* is not mentioned; what is mentioned are trials of claims, trials of cross-claims, trials of counterclaims, and trials of third-party claims. Lastly and barely mentioned as candidates for a separate trial are trials of issues.

It was innovative on the part of Safeco to make the attempt to take away the momentum which a plaintiff ordinarily achieves in putting on his case. The trial court, however, was well conversant with the orderly manner in which trials are presented, and ruled in a straight forward common sense short statement: "THE COURT: It's kind of a crap shoot in a way, I mean, rolling the dice with the motion." That ruling is not an issue on the appeal. The foregoing is presented to make a point only, *i.e.*, how erroneous and far afield the majority opinion takes itself in blaming Dr. Pacheco for Safeco's ill-starred motion to bifurcate.

### III.

### CORRECT STANDARD OF PROOF
#### (Majority's Part V)

Justice Huntley's opinion correctly notes that the trial court chose to instruct the

jury as to the burden of proof on the basis of a 1981 *Godwin* case from Arizona. *Godwin* sets the standard as being a mere preponderance of the evidence in a fraud case.

Justice Huntley, wholly at odds with his ordinarily extreme care, then makes the statement that the *"original complaint alleged fraud ..."* This is grossly in error. Nevertheless it reads so well that Justice Huntley has been taken in along with the other justices who are content to join an opinion which reads well. The original complaint alleged no fraud; in fact it made no mention of fraud. It alleged a policy of fire insurance purchased by Dr. Pacheco, a fire and fire loss, and sought to recover in excess of $189,000 on the policy of insurance. Just how the Huntley office became so confused in this case is unknown—and the confusion and error is rampant throughout the opinion. It is not Huntley quality, to say the least.

The Safeco brief filed in this Court may be responsible, in that it does not accurately portray the pleadings which were filed, although it certainly did *not* misportray the Pacheco complaint:

> 2. *Course of the Proceedings Below*
> Pacheco filed his complaint against Safeco on April 8, 1986, alleging willful, intentional, grossly negligent and vexatious conduct on the part of Safeco amounting to bad faith and sought punitive damages therefor. He also claimed damages under the policy for his property loss, his loss of business interruption and attorneys' fees. R., pp. 8–12.

> Safeco filed its answer denying Pacheco's claims and *raising the affirmative defense that Pacheco was intentionally responsible for the fire* and that, therefore, Safeco had no contractual obligation to pay or that public policy would estop Pacheco from claiming payment under the circumstances.

> . . . .

separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, al-

ways preserving inviolate the right of trial by jury as declared by the Constitutions, statutes or rules of the court.

Pacheco filed an amended complaint on December 9, 1986, again alleging willful, intentional, grossly negligent and vexatious conduct on behalf of Safeco amounting to bad faith, claims for loss of business interruption, attorney's fees, property loss under the contract and new claims for intentional infliction of emotional distress and defamation. R., pp. 53–56. Safeco answered the amended complaint by denying the claims and *raising the affirmative defenses already stated.* R., pp. 57–60. Safeco's Answer Brief, 1–2.

It is to be noted that Safeco referred to the appeal record. Of extreme importance to the giving of a correct instruction on Safeco's burden of proving its affirmative defenses is the Third Defense and Counterclaim plead in Safeco's first answer:

### I.

As an affirmative defense, defendant alleges fraud on the part of the plaintiff, in that the plaintiff himself, or through encouragement of others, caused the fire to occur at his dental office on the 2nd of January, 1986, with intent to obtain from defendant the proceeds of insurance for property allegedly destroyed in that fire. In furtherance of said fraud, he filed claims and made demands that defendant make a payment to him in excess of $189,000 under the policy of insurance issued to the plaintiff by defendant.

### II.

As an affirmative defense, defendant alleges illegality and estoppel. It would be illegal, or at least against the public policy of the State of Idaho, for this defendant to pay plaintiff any proceeds under the terms of plaintiff's insurance policy under the circumstances wherein the plaintiff, either personally or through others, intentionally caused the fire to occur in his dental office on the 2nd of January, 1986, and the plaintiff should be estopped from claiming under that policy.

### III.

As an affirmative defense, defendant alleges that it has no contractual duty to pay any monies to the plaintiff under the terms of his insurance policy for the said January 2, 1986 fire, for the reason that the fire was intentionally caused by plaintiff or by others acting with plaintiff's encouragement.

### COUNTERCLAIM

As and for a counterclaim against the plaintiff, the defendant alleges the following:

### I.

That on or about January 2, 1986 the plaintiff himself, or through the encouragement of others, intentionally caused a fire to occur at his dental office located on Tyhee Street, in American Falls, Idaho.

### II.

That prior to the said fire the plaintiff obtained a policy of fire insurance covering loss due to damage by fire to the said dental office and after the said fire made a claim against said policy for payment in excess of $189,000.

### III.

The actions of the plaintiff amount to fraud and misrepresentation and have caused the defendant to expend substantial sums to investigate the cause and origin of said fire and to defend itself in the plaintiff's action herein, all to the defendant's damage in the amount of $50,000 or such other amount as will be proven at trial. Defendant reserves the right to amend this counterclaim to allege specific damage amounts prior to trial as they become ascertainable.

### IV.

That the actions of the plaintiff are fraudulent and are of a nature that the courts should attempt to prevent others

from acting similarly and, therefore, punitive damages should be awarded to the defendant against the plaintiff in the amount of $50,000 or such other amount as would be appropriate under the circumstances.

## V.

Defendant has been required to defend itself against plaintiff's complaint and to bring this counterclaim and has and will incur attorney's fees, and should be awarded its reasonable attorney's fees and costs against the plaintiff.

R., p. 36 (From Safeco's first Answer and Counterclaim, filed June 13, 1986).

On December 22, 1986, Safeco filed an answer to Pacheco's amended complaint (the amendment being to add a count, as noted accurately in Safeco's brief, discussed above). In this pleading Safeco plead the same bad conduct on Pacheco's part, but, as will be noted, avoided using language previously used, namely "fraud" and "fraudulent":

## THIRD DEFENSE

### I.

As an affirmative defense, defendant alleges that it has no contractual duty to pay any monies to the plaintiff under the terms of his insurance policy for the said January 2, 1986 fire, for the reason that the fire was intentionally caused by the plaintiff or by others acting at plaintiff's instance or with his encouragement.

### II.

As an affirmative defense, defendant alleges illegality and estoppel, in that it would be illegal, or at least against the public policy of the State of Idaho, for this defendant to pay plaintiff any proceeds under the terms of plaintiff's insurance policy under the circumstances wherein the plaintiff, either personally or through others, intentionally caused the fire to occur in his dental office on the 2nd of January, 1986, and, therefore, the plaintiff should be estopped from claiming under the said policy.

It is readily assumed that in the considerable intervening time between Safeco's first and second pleadings, June 16 to December 22, research uncovered those cases which require fraud to be proved by clear and convincing evidence, notably of which *Gneiting v. Clement,* 96 Idaho 348, 528 P.2d 1283 (1974), is one, and a case cited therein, *Zuhlke v. Anderson Buick Co.,* 94 Idaho 634, 496 P.2d 95 (1972) is another. Justice Shepard authored both for a unanimous court. In *Gneiting,* Justice Shepard held that "[i]n Idaho, fraud is not presumed, but rather must be shown by clear and convincing evidence. (citing *Zuhlke* ). The evidence adduced ... was highly conflicting and an examination thereof persuades us that the trial court did not err in holding that *Gneiting* had failed to prove the fraudulent conduct on the part of the defendants." 96 Idaho at 350, 528 P.2d at 1285.

The trial court in this *Pacheco v. Safeco* case was presented with contra argument and authority by counsel for both parties.

Notwithstanding Idaho case precedent that clear and convincing evidence is required to prove fraudulent conduct, the trial court opted to go along with a 1981 Court of Appeals decision from Arizona, *Godwin v. Farmers Ins. Co. of America,* 129 Ariz. 416, 631 P.2d 571 (App.1981). In turn, this Court, through its majority, goes along with the trial court's choice. Unfortunately, neither the trial court nor the majority speaking for this court, has made any pretense of an independent review of the authorities which have been submitted. For instance, a case later than *Godwin* is *Hutt v. Lumberman's Casualty Co.,* 466 N.Y.S.2d 28, 95 A.D.2d 255 (1983). Here we are presented with a well-reasoned opinion, far superior to *Godwin.*

In comparing the work product of the two courts, it is first in order to note *Hutt's* recognition of and comment on *Godwin:*

We are cognizant that out-of-state authorities have divided on the question (see cases collected in *Godwin v. Farm-*

ers Ins. Co. of Amer., 129 Ariz. 416, 418–419, 631 P.2d 571, 574; *Great Amer. Ins. Co. v. K & W Log, Inc*, 22 Wash. App. 468, 472, 591 P.2d 457, 459; 46 C.J.S., Insurance, § 1359, pp. 567–568). We find those cases applying the clear and convincing standard (e.g. *Carpenter v. Union Ins. Soc.*, 284 F.2d 155, 162; *Jonas v. Northeastern Mut. Fire Ins. Co.*, 44 Wis.2d [347], 353, 171 N.W.2d 185, 187, n. 1) to be more in accord with New York law which has long imposed a "far more demanding" burden when a serious accusation involving moral turpitude, such as fraud, is leveled (*Jo Ann Homes at Bellmore v. Dworetz*, 25 N.Y.2d 112, 121, 302 N.Y.S.2d 799, 250 N.E.2d 214; see *Commissioner of Public Welfare of City of N.Y. v. Ryan*, 238 App.Div. 607, 265 N.Y.S. 286; *Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.*, 569 F.2d 181, 186 [2d Cir.]; Maguire, Weinsten, and Mansfield, Cases and Materials on Evidence [6th ed.], p. 1035; McCormack, Evidence [2d ed.], § 340, pp. 796–798). Moreover, the conflicting cases fail to recognize that, as we point out in the text, a clear and convincing standard relates to the quality rather than the quantum of proof (see, e.g. *Godwin v. Farmers Ins. Co. of Amer.*, supra; *Werner's Furniture v. Commercial Union Ins. Co.*, 39 Ill.App.3d 59, 349 N.E.2d 616; *Great Amer. Ins. Co. v. K & W Log, Inc.*, supra ). To the extent that *Demyan's Hofbrau v. INA Underwriters Ins. Co.*, 542 F.Supp. 1385 [S.D. N.Y.], which relied on *Johnson v. Agricultural Ins. Co.*, 25 Hun. 251, is to the contrary, we need simply say that it reflects an erroneous view of the law of this State, and therefore, we decline to follow it.

*Hutt*, 466 N.Y.S.2d at 30.

In particular, this Court, of all courts, this day should be heeding the language, "... [case] law has long imposed a 'far more demanding' burden when a serious accusation involving moral turpitude, such as fraud, is leveled." This Court through Justice Shepard might just as well not have written *Gneiting, Zuhlke*, both *supra,* and *Smith v. King,* 100 Idaho 331, 597 P.2d 217

(1979), the latter case also holding that the party alleging fraud has the burden of proving it by clear and convincing evidence. 100 Idaho at 334, 597 P.2d at 221. The case before us is a civil action. *Gneiting, Zuhlke*, and *Smith* were also civil actions. Those cases firmly established that in a civil action based on fraudulent conduct, the party claiming fraud has a higher burden than is present in the ordinary civil action where there is no element of fraud.

As to Arizona law, the *Godwin* court facially instructs us that "the burden of proof in civil cases is satisfied by the preponderance of evidence." BUT [a]n exception to this rule is that fraud must be proven by clear and convincing evidence." 631 P.2d at 573–574. The *Godwin* court then notes the argument "that arson by an insured to collect insurance premiums (sic, insurance proceeds) is a 'species of fraud' and as such must be proven by clear and convincing evidence." *Godwin*, 129 Ariz. 416 418–419, 631 P.2d 571, 573–574. The Arizona court is credible up to that point, and even cites appropriate cases for its statement.

Then, however, in order to be kind to insurance companies, it purports to see a distinction between allegations of fraud and allegations of arson. In the process it brings no credit to itself. First, and worst, it states in a vacuum, that "two major insurance treatises do not even recognize that a minority rule exists." Presumably it is referring to the rule it is about to announce as the majority rule, where it "concludes that, as in other civil cases where fraud is not specifically alleged, the defense of proving arson is satisfied by a preponderance of the evidence." *Godwin*, 129 Ariz. 416, 631 P.2d 571. The *Hutt* case cites only to *Appleman*. The *Appleman* section cited in *Godwin* is § 12229. The *Appleman* section cited in *Hutt* is § 12229. The New York court cites the section for the proposition:

"[T]hat, because arson is but one form of fraud in making a claim under a policy (omission) and an inference of arson must be strong and almost inevitable." Footnote 4 to the section cites to a Loui-

siana case for the proposition that "When proof of defense of arson to fire insurance claim is circumstantial, evidence must be so convincing that it will sustain no other reasonable hypothesis but that insured was responsible for the fire." *Baghramain v. MFA Mut. Ins. Co.*, La.App.1975, 315 So.2d 849, writ denied 320 So.2d 207 and 209 [La.] *Wallace v. State Farm Fire & Cas. Ins. Co.*, 345 So.2d 1004 (La.App.1977).

The Arizona court cited to § 76.664 in *Couch*, and only to that section. Only in that way could it say that *Couch* does not even recognize a minority rule. Section 79.477 of *Couch*, however, says:

> On the other hand, some courts adhere to the rule that the evidence must be the same as in the case of a criminal charge of arson, namely, that the fact must be established beyond a reasonable doubt, and the courts seem to gravitate toward the criminal law standard although purporting to retain the civil litigation pattern. Thus it has been stated that the claim of wilful destruction of the insured property must be established by proof of facts and circumstances of such a nature that no other conclusion can fairly or reasonably be drawn therefrom.

(Footnotes omitted, but cases cited in footnote 18 are from Pennsylvania, Iowa, and Louisiana.)

The *Hutt* case is the case to which this Court, if better informed, should be turning. And why? Because it is in accord with prior Idaho case law which holds that fraud in civil cases must be proven by clear and convincing evidence. Or, is *stare decisis* dying or dead in Idaho, or just used when convenient?

In New York, *Hutt* teaches us that "the more contemporary measure of persuasion is that of clear and convincing evidence" (citing to a number of cases); also

> "To fasten upon a man the act of wilfully and maliciously setting fire to his own building should certainly require more evidence than to establish the fact of payment of a note, or the truth of an account in setoff; because the improbability or presumption to be overcome in

the one case is much stronger than it is in the other. Hence, it can never be improper to call the attention of the jury to the character of the issue, and to remind them that more evidence should be required to establish grave charges than to establish trifling or indifferent ones." (quoting 2 Jones, Commentaries on Evidence [2d ed], § 563, p. 1036).

*Hutt*, 466 N.Y.S.2d at 30, 95 A.D.2d 255 (1983).

One might be asked what to make of the fact that Safeco amended its answer so as to remove the allegations of fraud and fraudulent conduct on the part of Dr. Pacheco which were contained in its initial answer. The general rule as stated in *Jenkins v. Donaldson*, 91 Idaho 711, 429 P.2d 841 (1967) is that the prior answer becomes *functus officio*, and is not properly in the record. In this case, however, it *is* still in the record, and moreover the defendant itself cites to it and uses it in its brief. If not properly in the record, rather than use it, Safeco could have moved that it be stricken. But it did not, notwithstanding its amended answer was so careful to not allege fraud.

That it is still in the record entitles not just Safeco to make use of and refer to it, but this Court as well may do so. Although an amended pleading supersedes the prior pleading as a pleading, the prior pleadings are not ineffective for all purposes. *Las Vegas Network, Inc. v. Shawcross*, 80 Nev. 405, 395 P.2d 520 (1964). A superseded pleading "nevertheless exists as an utterance once seriously made by the party (citing 2 Wigmore on Evidence, § 1067) and for certain purposes may be admitted in evidence." *Shurtliff v. Extension Ditch Co.*, 14 Idaho 416, 94 P. 574 (1908). This Court may make use of the record and do so in connection with resolving the issue as to whether arson is a species of fraud. Of course it is, and it is fraudulent conduct, as the New York court noted in *Hutt*, to buy insurance coverage, and light a fire to the buildings insured with collection of the policy proceeds in mind. By way of distinction, to set fire to an enemy's house as a means of revenge is

not fraudulent, although it is criminal, and also could result in a damage action sounding in tort.

There is no distinction, however, in alleging arson for profit or alleging fraudulent conduct, as Safeco initially did. We can best gauge what Safeco had in mind by its first pleading where it alleged both. There isn't a hair's breadth difference between the two.

## IV.

## SUMMARY

Today's majority puts its "Good Housekeeping Seal of Approval" on a common insurance company intimidation tactic—that of insinuating that its insured is guilty of crime, but doing so only in interjecting evidence of the criminal investigation into the civil action where the insured is seeking to collect the proceeds due on his insurance policy. Testimony as to a criminal investigation without there having been an ensuing trial and conviction, is not probative evidence. It is not probative evidence because a mere arrest, citation, or investigation is not inconsistent with the innocence of the insured. *Billington v. Schaal*, 259 P.2d 634, 637 (Wash.1953). See also *Fowler–Barham Ford v. Indiana Lumberman's Mutual*, 45 N.C.App. 625, 263 S.E.2d 825, 828–29 (1980). By allowing the reception of this evidence, the court permitted the insurer to cloak a civil trial with criminal innuendo without any evidence of criminal guilt. This is intolerable.

I recognize, as does the majority opinion at 798, 780 P.2d at 120, that there is other evidence, though circumstantial, that Pacheco may have been responsible for this fire. However, the ultimate result in any given case is not the only issue which an appellate court opinion must address. The larger, and perhaps in some cases more important, issue is the rule of law which issues from a case. Today's majority opinion offers a sure-fired insurance company recipe for avoidance of payment on a fire insurance claim. Only with Creator-like clairvoyance can the majority say that the admission of this testimony was harmless. The testimony of a senior investigator for the "Idaho Investigative Service Bureau" undoubtedly had an enormous impact on the jury. In a word the testimony was "dynamite", thoroughly prejudicial, and also not admissible.

If the insurance company has the stomach for charging its insured with arson, let it carry through with a full-scale criminal investigation and trial on the charge of arson, rather than this make hay in a civil action with a criminal investigation which has been initiated and then dropped and no charges brought—not then, later, or ever.

Regarding evidence of the 1982 fire, the majority opinion, while it does uphold the rule that evidence of other fires will not be admitted unless it can be established that the claimant was connected with starting those fires, *Hawks v. Northwestern Mutual Insurance Company*, 93 Idaho 381, 461 P.2d 721 (1969), nevertheless refuses to apply the rule of *Hawks* and worse yet pays no mind to the detailed requirements of *Boise Association of Credit Men, Ltd. v. United States Fire Insurance Company*, 44 Idaho 249, 256 P. 523 (1927). This stance is taken simply on the slender premise that Pacheco's counsel agreed that the 1982 fire could be mentioned only as having occurred, which is true, but without it being inferred that Pacheco caused the 1982 fire. Tr., v. 1, p. 21.

Parroting Safeco's brief, the majority opinion states that "once that evidence was introduced by Pacheco, then the prohibition of the rule of law in the cases cited by Pacheco did not apply." Majority opinion, at 800, 780 P.2d at 122. No authority is cited for this proposition, and for valid reason—there is none. The majority then proceeds to ignore the detailed requirements for proper proof of previous fires laid down by a unanimous court in *Boise Association of Credit Men, supra*, where it was stated:

Analyzing this offer, it is seen to embrace three propositions: First, that the plaintiff Smith had had previous fires; second, that at the time they occurred he had a motive for causing the fires, the motive being the same in all instances;

third, embraced within the portion quoted, that he caused the fires in pursuance of a comprehensive plan; and proof of all these propositions was necessary under any theory, to warrant the admission of the evidence offered. The establishment of the second proposition alone, namely, that Smith had in each case a motive for causing the fires, was of course insufficient to show that he did cause them. (*State v. Elwell,* 105 Or. 282, 209 Pac. 616 [ (1922) ].) To apply the rule which is followed in criminal cases where other offenses are sought to be established as evidentiary of the guilt of the defendant of the offense for which he is on trial, *it is essential to the admissibility of such evidence that proof of the other offenses must be plain, clear and conclusive, and evidence of a vague and uncertain character regarding them is not admissible.* (*Paris v. United States,* 260 Fed. 529 [ (8th Cir.1919) ]; *Baxter v. State,* 91 Ohio St. 167, 110 N.E. 456; 16 C.J. 592.) Before the proof of other fires is admissible in a prosecution for arson, *it must be established that the previous fires were incendiary.* (*Kahn v. State,* 182 Ind. 1, 105 N.E. 385 [ (1914) ]; *People v. Fitzgerald,* 156 N.Y. 253, 50 N.E. 846 [ (1898) ].) Without holding that the incendiary character of previous fires need be established in a civil action with the conclusiveness that is required by at least some of the decisions in criminal cases, it seems apparent that in this case, in order to admit evidence of previous fires, *it must be established by more than a mere suspicion that they were incendiary.* (See *Colonial Mutual Fire Ins. Co. v. Ellinger,* 112 Ill.App. 302; *Queen Fire Ins. C. v. Van Giesen,* 136 Ga. 741, 72 S.E. 41 [ (1911) ].) For all that appears in the offer, aside from the portion hereinabove quoted, the previous fires might have resulted from known and well-established natural or accidental causes, or under circumstances showing that Smith could not have been the responsible cause. *It was therefore necessary to include in the offer evidence of facts other than those merely establish-ing motive, showing or tending to show that Smith caused them;* and the effectiveness of the offer therefore depends upon the effect to be given the portion quoted, purporting to show that they were caused by Smith. This portion of the offer seems to be an argumentative conclusion from the preceding portion of the offer. No evidentiary facts tending to show that the other fires were of mysterious or unexplained origin, or could have been incendiary, or that Smith caused or could have caused the fires, were offered. Had the offer been admitted, defendants could have complied with it by merely presenting evidence that the other fires occurred, and that Smith had a motive for causing them, and without further showing could have argued as they did in the quoted portion of the offer, that Smith caused all the fires. In order to make a valid offer, counsel should have stated the specific facts which the testimony would establish, and the nature of the evidence by which he expected to establish physical facts which would at least be consistent with an incendiary origin of the previous fires and with Smith having been connected with causing them. An offer cannot be made in general terms, but must be so made as to give the court an opportunity to rule on the specific testimony, and must embrace all of the facts showing admissibility of the evidence, and must be of facts, and not of conclusions. (38 Cyc. 1334.) The offer was properly excluded.

*Boise Association of Credit Men, Ltd., v. United States Fire Insurance Company,* 44 Idaho at 259–61, 256 Pac. at 533–535 (1927) (emphasis added).

Vividly absent from the *Boise Association of Credit Men* opinion is any rule stating that once an insured himself mentions an earlier fire that such mere mention is sufficient to allow the insurer to interject by innuendo the suspicion that the insured may have had a role in starting that fire.

It appears to be that the majority, in its usual midsummer haste to produce an opinion, has relied too heavily upon Safeco's

brief instead of conducting an independent review of the record and the applicable law.

Finally, the majority opinion also errs by stating that it is sufficient to establish fraud through a preponderance of the evidence rather than requiring a clear and convincing standard of proof. The fact that other courts have required only a preponderance merely establishes that other courts have made the same mistake. Fraud is fraud and where it's raised as a defense in a fire insurance case should not lower the standard of proof. The absolute necessity of the high standard of proof is made particularly clear in this case where the insurer was allowed to introduce evidence of an aborted criminal investigation of Pacheco. Without meeting the highest standard that exists in law, that of beyond a reasonable doubt, which would have been necessary had the insurer followed through with a criminal trial on the charge of arson, here the insurer is allowed to prevail by establishing an implication of arson after satisfying the lowest burden of proof applicable in law. These circumstances cry out for the application of the clear and convincing standard where an unscrupulous insurer has been allowed to prejudice a jury with innuendo and suspicion. Prior Idaho case-precedent has required clear and convincing evidence to justify a finding of fraud.

There are many errors that took place during the trial which, under the time constraints this Court has placed on its members individually, because of other cases where there was equally dire need for my humble services, I have not yet addressed. Had there been time to do so, I do not doubt that on mature reflection this Court would correct the errors of law which are apparent in the opinion about to be published.

## APPENDIX A

... but not including the investigation that we've already talked about, what other investigation did you do with regard to this fire *and coming to some conclusion?*

A  Yes, I did talk with Mr. Pacheco's cleaning lady, Mary Farmer.

Q  And did you obtain any information from Mary Farmer that helped you in your investigation?

A  Yes, I did.

Q  What information did you obtain?

A  The information was that—

MR. WEBB: Excuse me, I'm going to object to it. Firstly, it's hearsay, secondly, he's apparently going to give us some kind of a compilation of what he purportedly learned from Mrs. Farmer. My inclination was not to object to the hearsay aspect if we're told what she said and not some kind of compilation of what he understood she was saying.

THE COURT: That's a good point.

MR. STEPHENS: That's fine, Your Honor, I'll rephrase it that way.

THE COURT: All right.

Q  Mr. Olmsted, what did she tell you that helped you in your investigation?

A  She had told me that in Mr. Pacheco's office—

MR WEBB: Excuse me. I thought we were going to testify as to what she said. What she told me, again, asks for a compilation or a summary.

THE COURT: That's correct. Please ask him a proper question and you answer it, sir.

Q  Mr. Olmsted, did you have a conversation with Mary Farmer?

A  Yes, I did.

Q  And could you tell us where the conversation took place?

A  I believe the conversation took place in Ken Price's residence.

Q  And was anybody else present when you had the conversation with her?

A  Lieutenant Hubbs, and I believe Ken Price was present.

Q  What did you ask her?

A  I asked what in Wil Pacheco's office was Mr. Pacheco proud of or his prize possession.

Q  And did she give you an answer, did she say anything in response to that?

A  Yes.

MR. WEBB: Your Honor, I'm going to object to that. I thought we were going to—hearsay is permissible as far as I'm concerned as to the facts that relate to the incident. But if we're going to talk about somebody's idea of what somebody else prizes, *then I am going to have to object on the basis that it's hearsay* and inappropriate at this state in the proceedings.

THE COURT: Mr. Stephens?

MR. STEPHENS: Your Honor, we're following the line of questioning just as Mr. Webb outlined it. Mr. Olmsted—I'm going to have to say some things here that Mr. Webb may not want the jury to hear. Obviously Mr. Olmsted asked questions of Mrs. Farmer in the course of conducting his investigation, and that's what we're getting into. He asked her a question that seems to me to be highly relevant to the situation, and she's going to give him an answer, and *it's information that he used to come to a conclusion.*

THE COURT: Is that correct, sir?

THE WITNESS: Yes, it is.

THE COURT: The objection is noted. Answer the question.

A  An oil painting of a bull elk in a meadow and a 35–millimeter camera on the bookcase in Mr. Pacheco's office.

Q  Now, did that information turn out to be of some significance to you in the course of your investigation?

A  Yes, it did.

Q  What significance did it have.

A  That both items were missing from the fire scene.

Q  Were those items that you were looking for when you went to Dr. Pacheco's home with the list that we discussed earlier?

A  Yes, it was.

Q  And were both of those items obtained at his home?

A  Yes, they were.

(Defendant's Exhibit No. 55 was marked for identification.)

Q  Mr. Olmsted, we've marked a photograph here, Exhibit 55 for identification. Just so we have this straight, you did not take that photograph, did you?

A  No, I did not.

Q  Can you identify what's in that photograph?

A  It's a Canon, it appears, 35–millimeter camera and flash.

Q  Do you know whether or not that's the camera that was found at Dr. Pacheco's home?

A  I do not know.

Q  Would somebody else have to identify that photo, then?

A  Yes.

Q  Do you know who that would be?

A  Officer Chris DeWald or Lieutenant Jerry Hubbs.

Q  Why don't you hand me that back.

A  (Hands to counsel.)

MR. WEBB: Hand it to me, maybe we can agree that it can come into evidence. (Defendant's Exhibit 55 handed to counsel.)

MR. WEBB: We have no problem with proposed Exhibit 55, Your Honor.

THE COURT: Thank you.

MR. STEPHENS: We would move for its admission, then.

THE COURT: Mr. Stephens, for the benefit of the jury, what does it depict and its location?

MR. STEPHENS: As soon as we admit it, I'll hand it to the witness and have him identify it.

THE COURT: Okay. 55 is admitted. (Defendant's Exhibit No. 55 was admitted into evidence.)

Q  Mr. Olmsted, after that's been admitted, what does that appear to be?

A  A 35–millimeter Canon camera with a large lens, I don't know exactly what kind of lens, and a flash.

Q  Let me put it this way. If I told you that was Dr. Pacheco's camera, would you have any reason to disbelieve that?

A  No.

Q Now, if I recall your testimony yesterday, you indicated that there was a saw that was obtained at Mr. Pacheco's home.

A Yes.

Q And do you have that saw with you today?

A Yes, I do.

Q Would you hand that to me so we can mark it—or hand it to the Sheriff here if you would.

A (Witness complies.)

(Defendant's Exhibit No. 56 was marked for identification.)

Q Now, Mr. Olmsted, when the saw was obtained at Mr. Pacheco's home, did you see and handle the saw at that time.

A I seen the saw, yes.

Q At his home?

A I believe it was actually at the police department when I actually seen the saw.

Q Okay. And could you tell me the events from the time that you left the home until the time you saw it, what happened?

A The saw remained—or was in the custody of Chris DeWald from the residence to the police department as far as I know.

Q And were you with him at that time?

A No, we were driving in separate cars, but we were together.

Q Did you follow him to the police station?

A Yes.

Q And when you got to the police station, is this the item that you saw?

A Yes.

Q And can you say with any certainty today that it's the same saw?

A It appears to be the same saw.

Q Now, you haven't had custody of that saw during the period of time between when it was taken to the sheriff's office until yesterday, have you?

A No.

Q Were you given custody of the saw yesterday?

A Yes, I was.

Q By who?

A By Lieutenant Jerry Hubbs.

Q And you've had it in your custody since yesterday?

A Since yesterday at 1900 hours.

MR. STEPHENS: Your Honor, we would move the admission of—what number is that, Mr. Olmsted?

A 56.

THE COURT: Show it to counsel, please.

(Defendant's exhibit No. 56 shown to counsel.)

MR. WEBB: May I inquire, Your Honor?

THE COURT: Certainly.

Q (Voir Dire by Mr. Webb) If I recall your testimony yesterday, Mr. Olmsted, you testified that at Wil's house he advised you that he had a hunting saw that was situated in a backpack down in his family room or basement area at the house.

A Basement, yes.

Q And that's, in fact, where the saw was found, inside the backpack?

A Yes.

Q Which Wil disclosed to you?

A Yes.

Q Now, you've told Mr. Stephens that this is essentially in the condition that it was when you saw it from Officer DeWald. That's not quite true, is it, Mr. Olmsted?

A The saw, yes, other than the sticker.

Q I'm talking about the exhibit which is a saw and a sheath. Was it apart like this (indicating)?

A No, the sheath was not apart.

Q The sheath was an integral sewed up unit typical of other hunting saw sheaths that you've seen?

A Yes.

Q Do you know who took it apart?

A No.

Q As a matter of fact, it was submitted to the FBI for examination, wasn't it?

A  I believe that it had been.

MR. WEBB: We don't object to the reception into evidence of the proposed Exhibit 56 so long as it includes the sheath which is an integral part of the proposed exhibit.

THE COURT: Do you have any objection, Mr. Stephens?

MR. STEPHENS: No, Your Honor.

THE COURT: Exhibit 56, including the sheath, is admitted into evidence.

(Defendant's Exhibit No. 56 was admitted into evidence.)

Q  Mr. Olmsted, *did you* look at that saw and *consider that saw in coming to some conclusion later on with regard to your investigation?*

A  Yes, I did.

Q  Did you ever make a decision yourself, your own opinion, as to whether or not that saw could have been used to make the cut in the wall?

MR. WEBB: I'm going to have to object to that. They submitted this to the FBI and got back a report and it said it could not be connected.

MR. STEPHENS: That's incorrect, Your Honor.

MR. WEBB: Are we going to have this override the FBI?

MR. STEPHENS: That's a misstatement, Your Honor.

MR. WEBB: It's not a misstatement, it's directly from the FBI report.

MR. STEPHENS: Your Honor, we need to get the report, then, and have Mr. Olmsted discuss that report. This is a very inappropriate objection.

THE COURT: Do you have the report?

MR. STEPHENS: Mr. Olmsted does, I think.

THE WITNESS: No.

Q  You don't have it?

A  No, it's at American Falls—

Q  It's where?

A  It's at the American Falls Police Department.

Q  Do you have a copy of the report?

THE COURT: Excuse me, counsel. For now anyway, answer yes or no to his question. Do you remember what the question was?

THE WITNESS: Yes.

THE COURT: Just answer yes or no.

A  Yes.

Q  Did you consider the report from the FBI in coming to your conclusion?

A  No, I haven't seen the report. I've heard of the report, heard of what was on the report, but I haven't seen the report from the FBI.

Q  Do you know who that report went to?

A  Pardon?

Q  Do you know who that report went to?

A  American Falls Police Department.

Q  So would Jerry Hubbs have that?

A  Now, *what conclusion did you come to with regard to your own view of the saw and the cut in the wall as to whether or not that saw could have been used?*

MR. WEBB: I'm going to object. There's insufficient foundation that this witness has anything upon which to base such an opinion.

THE COURT: Sustained at this time.

Q  Mr. Olmsted, did you look at the cut in the wall, the sheetrock?

A  Yes, I did.

Q  And you observe how the cut was made?

A  Yes, I did.

Q  And did you compare the saw and the teeth on that saw with the cut in the sheetrock that you saw at the fire scene?

A  Yes.

Q  Do you have a saw similar to this yourself?

A  Yes, I do.

Q  Did you, in fact, do any testing on your own with regard to either saw and sheetrock?

A  Yes, I did.

Q And did that—could you describe what you did in that test?

A I took a sheet of sheetrock and with my saw I cut the sheetrock to see what type of marks were left on the sheetrock.

Q How similar to this saw sitting in front of you is the saw that you have at your home?

A Quite similar other than mine has a plastic cap here (indicating) instead of a metal screw.

Q How about the teeth?

A The teeth are identical as far as I can tell, identical or similar.

Q Based on that, the view of the sheetrock at the fire scene, the view of both saws, and your experiment at home, *did you reach in your own mind a conclusion of whether or not* —I'm not asking you whether or not this saw was used, but whether or not *it could have been used to make the cut that you saw at the fire scene?*

A Yes, I did.

Q And what opinion did you arrive at?

MR. WEBB: We have the same objection. We think this is speculation and not opinion, Your Honor.

THE COURT: Mr. Olmsted, your opinion wouldn't be to the effect that Exhibit 56 was the saw that cut the hole, would it?

THE WITNESS: No.

THE COURT: And might I just ask— would you like to ask any questions in aid of objection, Mr. Webb, any further questions?

MR. WEBB: No, Your Honor.

THE COURT: Well, *how many saws,* Mr. Olmsted, *of this same make are there in existence, do you know?*

THE WITNESS: *I have no idea, I don't.*

THE COURT: I'll let you go ahead and answer the question. Go ahead.

A The question again?

Q Let me rephrase it, Mr. Olmsted. I'm asking you if you were able to determine not that this was the saw that made the cut, but whether or not in your opinion the saw could have been used to make the cut that you saw at the fire scene?

A Yes.

MR. WEBB: Excuse me. I think what the Court permitted the response to was whether a saw of this kind could have been the saw that caused the cut.

THE COURT: Correct, not whether or not this saw could have been the saw.

MR. STEPHENS: That's fine.

THE COURT: So rephrase your question, please.

Q Could the saw of the kind that's sitting in front of you have been used to make the cut that you saw at the fire scene?

A Yes.

Q *And was that information that you used in helping you to come of the conclusion later on* in the investigation?

A Yes, it was.

Q Now, did you interview anyone to determine whether or not the doors were secure or not at the time of the fire at the Pacheco office?

A Yes.

Q Who did you talk to in regard to that?

A Officer Chris DeWald and Lieutenant Jerry Hubbs.

Q *And what did Officer Jerry Hubbs tell* you with reference to the doors as to whether or not they were locked?

MR. WEBB: *We are going to object until that witness is called so we can cross-examine the declarant. It's hearsay,* Your Honor.

MR. STEPHENS: Your Honor, we are going to call Officer Hubbs. All I'm trying to establish here is that Officer *Olmsted relied on this information to come to a conclusion.* If we have to stop now and call Mr. Hubbs and then put Mr. Olmsted back on, it's going to get ridiculous.

THE COURT: If you are going to call him—

MR. STEPHENS: We will call Chris De-Wald as well, sir.

THE COURT: Lay more foundation, when and where the conversation took place, who was present and so on.

Q  Do you know where you talked to Officer Hubbs about the locks?

A  Yes, in the American Falls Police Department.

Q  And approximately when?

A  It would have been January 2nd—2nd or 3rd. I'm not sure of the date. It was the 2nd or 3rd.

Q  And do you have any recollection as to whether or not anybody else would have been there when you had the conversation?

A  I do not recall if there were other people there.

Q  *What did Officer Hubbs tell you* with regard to the locks?

MR. WEBB: The objection is that *this is hearsay,* and I don't care whether it's for a purpose or not, it's still hearsay. It's a declaration of someone who is not in court at this time to permit cross examination.

MR. STEPHENS: Your Honor, we've gone through this before and *hearsay is admissible when we're setting the foundation with regard to an opinion that an expert* has relied upon, and that's where we're going and everybody knows that, and that's the only reason we're talking about this. If he relied on something that's not reliable, I guess they can cross-examine Mr. Hubbs.

THE COURT: *The statement will be admitted* for the fact that it was said and not necessarily for its truth or falsity and as a basis for which the witness reached his ultimate opinion.

So go ahead and answer, sir.

A  Yes, that both doors to Wil Pacheco's office were locked at the time of the fire.

Q  *Did you use that information in formulating an opinion* later on with regard to some conclusion at the end of the fire—the investigation?

A  Yes, I did.

Q  Now, did you yourself conduct or see that there was conducted any investigation surrounding any keys that might have been available to people to those doors?

A  Yes.

Q  And what was done in that regard?

A  Lieutenant Jerry Hubbs interviewed the parties involved that would have a key to Mr. Pacheco's office.

Q  It was your understanding that Officer Hubbs interviewed those people?

A  Yes. I attended some of the interviews.

Q  And generally who—we don't need to know all of them, but what kinds of people were they that you understood had keys?

A  Cleaning lady, office help, hygienist, that type of thing.

Q  Did you use any of the information from that research or—well, let me rephrase that.

*The information obtained from that investigation, was that used by you in later coming to a conclusion?*

A  Yes.

Q  Now, did you ever interview an Officer Gary King?

A  Yes.

Q  *Did you receive any information from him that you used in coming to a conclusion* with regard to your investigation?

A  Yes.

Q  Now, where did you have the conversation with Gary King?

A  American Falls Police Department.

Q  Do you remember approximately when?

A  I do not recall if it was the 2nd or 3rd, it was one or the other.

Q  It would have been the 2nd or the 3rd?

A  It was the 2nd or the 3rd.

Q  Do you know where in the police department the conversation took place.

A  Yes.

Q  Where?

A  In front of the dispatch desk.

Q  And do you know if anyone else was present?

A  Lieutenant Jerry Hubbs.

MR. STEPHENS: And, Your Honor, I'm going to ask this question and we're not offering it to prove that it's true, but only that this was information that Mr. Olmsted had in reaching a conclusion.

Q  *What did he tell you that you used in your investigation?*

MR. WEBB: And to that, Your Honor, *we'll have to object. Once again, the witness is not here for cross examination.* The declaration is obviously intended to be used as substantive proof contrary to what counsel says, and for that reason the objection should stand.

THE COURT: Is Officer King going to testify?

MR. STEPHENS: He definitely will testify, Your Honor.

THE COURT: Counsel approach the bench, please.

(Discussion off the record.)

THE COURT: Ladies and gentlemen, we'll take the morning recess now. We have something to take up outside of your presence again. So please remember the same admonition I've given you previously, and if you would retire to the jury room, please. (Jury excused.)

(The following proceedings were had in open court, outside the hearing the presence of the jury:)

THE COURT: The record will reflect the jury has been excused from the courtroom.

The Court just had a conference with counsel at the bench off the record, but the Court is concerned about allowing Mr. Olmsted to continue testifying about conversations he had with other individuals in reaching his decision prior to these individuals testifying. The Court is aware that experts can base their opinion on many things, but I'm not sure that in a jury trial that it's proper to continue to allow him to testify as to what other people told him before these individuals themselves are called to testify.

Would you like to be heard on that, Mr. Stephens?

MR. STEPHENS: Yes, Your Honor.

Your Honor, the reason we have to take this course that we are is because there's been an objection made by counsel with regard to the opinion testimony, and we are laying the foundation as we are required to do. *Mr. Olmsted is going to be asked,* as we have already notified the Court, *if he arrived at an opinion based on his experience and investigation as to who the chief suspect was. This information that he's giving to the Court is information that he will testify that he used in arriving at that opinion.* **The fact that it is hearsay is meaningless with regard to opinion testimony.**

We've also notified Court and counsel that all of these witnesses that have been discussed today with regard to Mr. Olmsted, including Gary King, have been subpoenaed and will be called by the defense in their case in chief, they're subject to cross examination, *and it really just goes to the weight of whether or not he relied on pertinent information in formulating his opinion, and then the jury can weight whether or not he had appropriate information.*

And it further goes, Your Honor, to the issue of bad faith because this information that he arrived at in formulating his opinion he will also later say was given to Al Peterson at Safeco prior to the filing of the complaint by the plaintiff, and, of course, this is at the heart of the matter and that's why we're here and that's why we're trying to do.

If the objection had not been made with regard to laying such a foundation on his opinion, then we may not have to go into this. But we really have to go into it because, as I understood it, the Court pretty well told me that if you don't have a good foundation when he gives the opinion, you may not let him give that opinion.

THE COURT: That's correct.

MR. STEPHENS: So we're making sure that you're aware of all the factors that he used in coming to that opinion. I'm not trying to do anything that I'm not going to back up with other witnesses, Your Honor. That's where we are.

*I really don't see that this is a proper objection. We're calling this man as an expert. I don't see that hearsay has anything to do with it.*

Your Honor, we would indicate, though, that if the objection is sustained to this question and later on Mr. Olmsted is not allowed to give his opinion, we would think that we would have the right to call him again after all these witnesses are on and ask him that opinion again.

THE COURT: Well, I would probably agree with you there.

Mr. Webb?

MR. WEBB: That particular question that's before the Court at this time is a crucial one. It relates to purported viewing of a pickup with a camper shell that resembles one that's owned by Dr. Pacheco. It's critical also as to the time and what the officer saw. It's clearly hearsay. *Hearsay does not become any less hearsay because of a promise of counsel that he's going to call someone else. The jury hears it, and even if the someone else testifies to the truth of the situation and it comes out differently, they still hear the version that this witness offers to them.* It's inappropriate under the opinion rule.

I have read extensively on this question, as I expect Court and counsel have, too, and what Professor Moore says and the other authorities on evidence say is that you are not permitted as an expert to give specific testimony of what someone else said. You can talk about data, you can talk about the general sense of conversations, but you cannot give specific hearsay statements. That just is not part of the opinion formulation—it may be part of the formulation process, but not of the opinion expression process. So we think that the object is good.

THE COURT: Thank you, sir.

MR. STEPHENS: Your Honor, we would be more than happy to do that, in fact, that's what we attempted to do with the prior questions, and the objection came and said no, we want a definite conversation. I was asking him what information did you gain in your investigation, and they objected and wanted the specific questions. We're not the ones that got us started down this path.

THE COURT: Okay, Mr. Stephens.

Mr. Webb, if the phraseology of the question is, you know, like did you discuss this with Officer DeWald and whoever and based on that discussion—or what information did you derive from that discussion which you used as one of the bases for your opinion, would you still have the same objection?

MR. WEBB: Yes, I think I would have to have, Your Honor.

I wouldn't have an objection to the witness saying that he discussed the matter with Officer King and that that discussion, without identifying what was said, was part of the information that he relied upon in reaching his conclusions. We're going to continue to object to those conclusions because they're legal conclusions, they are not opinion. But I think that would be appropriate for him to talk about. But the specifics of the conversation is just a way to try to get hearsay before the jury.

THE COURT: I agree, Mr. Stephens, I agree with Mr. Webb. It looks to me like these witnesses should have been called first and advise the jury what they told Officer Olmsted. That would be admissible, of course. *But we're doing it, it looks to me, backwards,* and I am somewhat bothered by this procedure. And I'm not being critical of you, I know you have scheduling problems with witnesses.

Tr. Vol. IV, 748–771 (emphasis added).